850 So.2d 582 (2003)
Marysol SIERRA, as Personal Representative of the Estate of Michael Carlos Sierra, as Wife of Michael Carlos Sierra, and as Parent and Legal Guardian of Miguel Sierra and William Sierra, Appellant,
v.
ASSOCIATED MARINE INSTITUTES, INC., a Florida corporation, Department of Juvenile Justice, an agency of the State of Florida, and Big Cypress Wilderness Institute, Inc., a Florida corporation, Appellees.
No. 2D01-2406.
District Court of Appeal of Florida, Second District.
June 18, 2003.
Rehearing Denied July 23, 2003.
*584 James L. O'Leary, II, of JLOESQ, LLC, Bonita Springs, for appellant.
Hinda Klein of Conroy, Simberg, Ganon, Krevans & Abel, P.A., Hollywood, for appellees Associated Marine Institutes, Inc. and Big Cypress Wilderness Institute, Inc.
Esther E. Galicia of George, Hartz, Lundeen, Fulmer, Johnstone, King & Stevens, *585 Fort Lauderdale, for appellee Department of Juvenile Justice.
NORTHCUTT, Judge.
The week after Michael Sierra began working as a counselor at a residential juvenile detention camp, two of the camp's residents murdered him. His widow, Marysol Sierra, filed a wrongful death suit against the Department of Juvenile Justice and against her husband's employers, who operated the camp under contract with the Department. On motions by the three defendants, the circuit court dismissed Mrs. Sierra's action with prejudice. The court ruled that the employers were entitled to workers' compensation immunity and, further, that all defendants were shielded from liability by sovereign immunity. We conclude that Mrs. Sierra alleged facts sufficient to except her suit from the employers' workers' compensation immunity. Also, the second amended complaint did not demonstrate that sovereign immunity shielded the defendants from liability for the acts alleged. Accordingly, we reverse the dismissal of Mrs. Sierra's suit and remand for further proceedings.

FACTS
For these purposes we must treat the material factual allegations of Mrs. Sierra's pleadings as true. See Curtis v. Henderson, 777 So.2d 1017 (Fla. 2d DCA 2000). They reflect that Big Cypress Wilderness Institute was a "level 8" high-risk residential juvenile detention facility commonly known as a "boot camp," housing felons aged fourteen to eighteen. It was located on federal land in the Big Cypress National Preserve by virtue of an agreement between the National Park Service and the Florida Department of Juvenile Justice. The boot camp was operated by Big Cypress Wilderness Institute, Inc., pursuant to a contract between DJJ and BCWI's parent, Associated Marine Institutes, Inc.
That contract acknowledged that a high-risk residential placement required "close supervision in a standard residential setting that provides 24-hour secure custody, care, and supervision." Juveniles with a history of "serious felony offenses" were placed in such facilities out of "concern for public safety that outweighs placement in lower risk programs."
Commensurate with this risk level, AMI's contract and an amalgam of DJJ rules and procedural manuals imposed stringent security requirements. Thus, for example, high risk facilities such as Big Cypress were to have twelve-foot fences topped by razor wire. Staff members were required to undergo a rigorous orientation that included training in verbal and physical use of force, familiarization with policies and procedures, and "job shadowing" of experienced staffers. Until this training was completed, a new staff member was not to have direct contact with youths except under the direct supervision of a certified drill instructor or camp commander.
The DJJ Residential Commitment Service Manual, applicable to Big Cypress pursuant to the DJJ/AMI contract, called for continual assessment of each youth in the program to monitor his level of risk. The program was to devise and maintain an "alert system," whereby all members of the staff would be apprised of specific developments affecting an individual youth's level of risk. These included, for example, such things as an escape attempt or an assault or threat against another resident within the previous 30 days. The manual warned that youths assessed as risks should not be allowed off-campus or to participate in work projects in which they had access to work tools that could be used *586 as weapons or means of escape. Moreover, all off-site work projects were to be supervised by at least two trained staff members.
The two youths who murdered Michael Sierra had been assessed as risks for escape. Jermaine Jones had a record of offenses including aggravated assault, cocaine possession, battery, resisting arrest, and a prior escape. He had attacked a staff member in the past and had made threatening remarks on three separate occasions. Mazer Jean's record included burglary and possession of a short-barreled rifle, and he had made threatening remarks twice.
On the Sunday before Sierra's death, Jones and Jean had a verbal confrontation, culminating in Jones's threat to "split Jean's head to the white meat." On learning of the altercation, supervisor Erroll Denson placed them both on "contract," a form of punishment requiring the offender to "pay off" the contract with heavy manual labor. Jones in particular expressed anger about this, prompting one staffer to warn that he feared Jones would try to escape and that he should be closely watched.
At 7:19 p.m. on the second day after the altercation between Jones and Jean, Denson instructed Sierra to accompany them and a third youth named Sal Beatty to a work site next to a pond roughly 100 yards outside the Big Cypress compound, where the youths were to fell trees as part of their "contract" punishments. Denson ordered Sierra to oversee the work project until 9:00 p.m., when the group was to return to the compound.
Sierra had been employed as a youth counselor at Big Cypress only eight days. According to Mrs. Sierra's second amended complaint, BCWI had failed to provide Sierra with the required new staff orientation or a copy of the employee handbook. It had never given him the DJJ-required written test on the policies and procedures governing Florida juvenile boot camps, nor had it given him the mandated video training about the boot camp's policies and procedures. Further, Sierra was never warned of the violent threats by Jones or that his fellow staff member thought Jones might try to escape.
Sierra retrieved his car keys from a locked box located in the administrative office, and took his jacket from the trunk of his car. But he did not return the keys to the office as required by policy. Instead, he placed them in his pocket. Sierra next took the three youths to select tools for the work project. Jean and Beatty chose machetes, and Jones took a pickaxe. The four then walked out to the work site.
During a water break at approximately 8:25 p.m., Jones and Jean killed Sierra by repeatedly striking him about the head with their work tools. They took Sierra's car keys, rolled him into the pond, returned to the Big Cypress compound, and escaped in Sierra's car.

WORKERS' COMPENSATION IMMUNITY
Workers' compensation immunity, like other affirmative defenses, may justify dismissing a suit at the pleadings stage only if the plaintiff's complaint affirmatively and clearly demonstrates the conclusive applicability of the defense. Vause v. Bay Med. Ctr., 687 So.2d 258, 261 (Fla. 1st DCA 1996). We conclude that Mrs. Sierra's second amended complaint did not conclusively demonstrate that Florida's Workers' Compensation Law immunized AMI and BCWI from liability.
Section 440.11, Florida Statutes (1997), protects employers from tort liability for injuries to their employees except in limited situations identified in the statute. *587 In addition, Florida courts recognize an exception for intentional torts where an employer has either exhibited a deliberate intent to injure or engaged in conduct that is substantially certain to result in injury or death. See Eller v. Shova, 630 So.2d 537, 539 (Fla.1993); Fisher v. Shenandoah Gen. Constr. Co., 498 So.2d 882, 883 (Fla. 1986).
In Turner v. PCR, Inc., 754 So.2d 683 (Fla.2000), the Florida Supreme Court reaffirmed the existence of an intentional tort exception to workers' compensation immunity. When doing so, the court clarified the law in some important respects. First, the court disavowed suggestions in Fisher, 498 So.2d 882, and Lawton v. Alpine Engineered Products, Inc., 498 So.2d 879 (Fla.1986), that the "substantial certainty of injury" standard for avoiding workers' compensation immunity requires a showing that the employer's conduct created a "virtual certainty" of injury. Turner, 754 So.2d at 687 n. 4; see also EAC USA, Inc. v. Kawa, 805 So.2d 1 (Fla. 2d DCA 2001).
The Turner court also held that when applying the "substantial certainty of injury" standard, the employer's conduct must be evaluated under an objective test, as opposed to a subjective one. In other words, the plaintiff need not show that the employer actually knew that its conduct was substantially certain to cause an injury. Rather, the employer may be held liable if it "should have known ... that the conduct complained of was `substantially certain to result in injury or death.'" Id. at 688-89. Therefore, "[u]nder an objective test for the substantial certainty standard, an analysis of the circumstances in a case would be required to determine whether a reasonable person would understand that the employer's conduct was `substantially certain' to result in injury or death to the employee." Turner, 754 So.2d at 688.
Turner involved an explosion at a chemical plant that killed the plaintiff's decedent, a worker at the plant. The plaintiff alleged that the employer knowingly used a highly unsafe processing method that was substantially certain to result in injury or death. The supreme court reversed a summary judgment granted to the employer on its workers' compensation immunity defense. It held that, under an objective test measuring whether the employer engaged in conduct that was substantially certain to result in injury, the record presented genuine issues of material fact that precluded summary judgment. Turner, 754 So.2d at 689-90. Most of the Florida cases addressing this issue also involve allegations that the employer knowingly created or permitted a dangerous physical condition in the workplace, e.g., removing safety guards from equipment, EAC USA, 805 So.2d at 3; improperly guarding an open elevator shaft, Gerth v. Wilson, 774 So.2d 5 (Fla. 2d DCA 2000); or failing to maintain a commercial aircraft, Connelly v. Arrow Air, Inc., 568 So.2d 448 (Fla. 3d DCA 1990).
Fewer cases have involved allegations that employers failed to protect their employees from or warn them against the danger of violence by third persons. The courts have rejected these claims when the danger posed by third persons was too generalized to permit a conclusion that the employers' failure to protect or warn against it was substantially certain to result in injury. See, e.g., Garrick v. Publix Super Mkts., Inc., 798 So.2d 875 (Fla. 4th DCA 2001) (holding that injured security guard's allegation merely that employer knew, and deliberately withheld, that robbery was going to occur at one of two super markets on unspecified date at unspecified *588 time was insufficient to defeat workers' compensation immunity).
Other cases predated Turner and applied the "virtual certainty of injury" standard when rejecting claims based on the employers' failures to protect or warn against generalized danger from third persons. See, e.g., Clark v. Gumby's Pizza Sys., Inc., 674 So.2d 902 (Fla. 1st DCA 1996) (rejecting pizza delivery employee's claim based on allegations that his employer failed to warn of dangers of delivering to certain areas of town at night); Gen. Motors Acceptance Corp. v. David, 632 So.2d 123 (Fla. 1st DCA 1994) (holding insufficient employees' claim based on employer's failure to take security measures to prevent customers from having direct contact with employees); Folk v. Rite Aid of Fla., Inc., 611 So.2d 35 (Fla. 4th DCA 1992) (concluding that employer's conduct in failing to permit security guard to carry weapon was not virtually certain to result in his injury or death). In one case, the court rejected a claim because the employer's lack of experience or expertise was such that a reasonable person in its place could not have foreseen that an employee, angry at being laid off, would make good on his threat against his supervisor. Holderbaum v. Itco Holding Co., 753 So.2d 699 (Fla. 3d DCA 2000).
None of those cases involved the situation here, in which an employer is alleged to have knowingly placed an unprotected employee directly in contact with specific, violent individuals. Although a similar circumstance was presented in ACT Corp. v. Devane, 672 So.2d 611 (Fla. 5th DCA 1996), the issue was not decided. In that case, a residential counselor at a runaway shelter sued her employer after suffering injuries at the hands of a shelter resident. The court determined that it had no jurisdiction to entertain the employer's appeal of an order denying its motion for summary judgment based on workers' compensation immunity. Therefore, it dismissed the appeal without determining whether the employer's alleged conduct could be deemed substantially certain to result in injury or death.
Our research has disclosed no other Florida case addressing the workers' compensation immunity issue under circumstances such as these, but we have found helpful decisions in other states. Like Florida, Ohio law recognizes an exception to workers' compensation immunity when the employer engages in conduct that is substantially certain to result in injury. Fyffe v. Jeno's, Inc., 59 Ohio St.3d 115, 570 N.E.2d 1108 (1991); Blankenship v. Cincinnati Milacron Chem., Inc., 69 Ohio St.2d 608, 433 N.E.2d 572 (1982).[1] Unlike Florida, Ohio measures this standard by a subjective test, as opposed to the more lenient objective test adopted in Turner. Fyffe, 570 N.E.2d at 1112. In Ross v. Maumee City Schools, 103 Ohio App.3d 58, 658 N.E.2d 800 (1995), Ohio's Court of Appeals for the Sixth District applied these principles to the case of a teacher's assistant assigned to serve as the sole classroom aide to a fourteen-year-old boy who was severely mentally retarded and suffered other handicaps. It became apparent that the boy was prone to sudden *589 violent outbursts. Because of this, and because the boy was as large as the aide, she had difficulty handling him. Nevertheless, her requests for assistance or for the boy to be given a different placement went unheeded. Eventually, the boy injured her. The aide sued the school system, alleging that she was injured as a result of the school system's intentional conduct. The trial court granted summary judgment for the employer, finding among other things that the uncontested material facts failed to show that the employer's conduct was substantially certain to result in injury. The appellate court reversed, holding that the facts of the case did present an issue on that point. Ross, 658 N.E.2d at 805.
Washington, too, permits an intentional tort exception to workers' compensation immunity, but the test for achieving it is much more stringent than Florida's. In Birklid v. Boeing Co., 127 Wash.2d 853, 904 P.2d 278 (1995), that state's supreme court expanded its interpretation of a statutory exception to workers' compensation immunity founded on the employer's "deliberate intention" to cause injury. In so doing, however, the court rejected the "substantial certainty of injury" standard as too expansive. Id. at 285. Rather, it held that an employer could be held to have a "deliberate intention" to injure so as to subject it to suit if it had "actual knowledge" that an injury was "certain to occur" and "willfully disregarded that knowledge." Id.
In Stenger v. Stanwood School District, 95 Wash.App. 802, 977 P.2d 660 (1999), the court applied the Birklid standard to a scenario similar to the one in Ross, involving two public school instructional aides who were injured while assigned to work with a severely disabled special education student. Reversing a summary judgment for the employer, the court held that the employer's knowledge of the boy's extensive history of aggressive and violent behavior would permit a jury to find that the employer had actual knowledge that the staff would continue to be injured by the boy in the future and that the employer willfully disregarded this knowledge.
The Ross and Stenger courts recognized intentional tort exceptions to workers' compensation immunity where employers knowingly placed employees directly in contact with specific, violent individuals. They did so under tests that were more demanding than Florida's, based on facts that were less compelling than alleged by Mrs. Sierra in this case. Here, in waning daylight the employer allegedly sent a new, inexperienced, and incompletely trained employee into the woods 100 yards from the relative safety of the workplace to supervise, on his own, three teenaged felony offenders. Two of the employee's charges had violent histories, and the employer knew, but the employee did not, that these two were specifically assessed as escape risks. The youths were armed with machetes and a pickaxe. The employee wielded only a walkie-talkie.
If proved, the facts alleged could convince a jury that when Sierra was sent into those woods his employer should have known there was a substantial certainty that doing so would result in his injury or death. More precisely for our purposes, Mrs. Sierra's second amended complaint did not affirmatively and clearly demonstrate the conclusive applicability of AMI's and BCWI's workers' compensation immunity defense. See Vause, 687 So.2d at 261. Therefore, the circuit court should not have dismissed the action based on workers' compensation immunity.

SOVEREIGN IMMUNITY
The circuit court listed two bases for dismissing Mrs. Sierra's suit on sovereign *590 immunity grounds. The court held that the defendants were immune from "such intentional torts" and that the conduct alleged in the second amended complaint constituted planning level activity for which sovereign immunity was not waived.
We must preface our discussion of these issues with two observations. First, as in the case of workers' compensation immunity, sovereign immunity generally is an affirmative defense that may justify granting a motion to dismiss only when the complaint itself conclusively establishes its applicability. Vause, 687 So.2d at 261; Randles v. Moore, 780 So.2d 158 (Fla. 2d DCA 2001); City of Ft. Lauderdale v. Todaro, 632 So.2d 655 (Fla. 4th DCA 1994). In light of this principle, our second observation is that Mrs. Sierra's second amended complaint did not conclusively demonstrate that AMI and BCWI are entitled to any form of protection under sovereign immunity.
In this case the defendants' claims to sovereign immunity stem from different sources. The DJJ, of course, is a government agency. Its immunity from liability flows directly from the sovereign. § 768.28(2), Fla. Stat. (1997). AMI and BCWI, on the other hand, are private corporations that have contracted to furnish services to the state. Their entitlement, if any, to sovereign immunity protection turns on whether they can be deemed agents of the state under either common law or statute.
Under common law principles, a provider's status as either an agent of or independent contractor to the state depends on the degree of control the state exercises over the provider's performance of its duties. Stoll v. Noel, 694 So.2d 701 (Fla.1997). Here, the second amended complaint alleged that AMI and BCWI acted pursuant to a contract that incorporated by reference a number of other rules, policies, and manuals. The exhibits to the second amended complaint included some of these referenced materials, but not all of them. In some instances, such as the DJJ Residential Commitment Service Manual, only a portion of the incorporated document was attached. For this reason, the record was insufficient to permit a determination of the degree to which the DJJ exercised control over AMI and BCWI in the performance of their duties. See Agner v. APAC-Fla., Inc., 821 So.2d 336 (Fla. 1st DCA 2002), review denied sub nom AIM Eng'g & Surveying, Inc. v. Agner, 842 So.2d 842 (Fla.2003) (table decision); see also Robinson v. Linzer, 758 So.2d 1163 (Fla. 4th DCA 2000), review denied sub nom Cubas v. Robinson, 780 So.2d 912 (Fla.2001); Theodore ex rel. Theodore v. Graham, 733 So.2d 538 (Fla. 4th DCA 1999). Moreover, even a true agent is liable for acts outside the scope of the agency relationship or contrary to the principal's instructions, whether or not the principal can be sued. Dorse v. Armstrong World Indus., Inc., 513 So.2d 1265, 1268 n. 4 (Fla.1987) (citing Tedder v. Riggin, 65 Fla. 153, 61 So. 244 (1913)). Here, even if the contract and the evidence established that the state exercised control over AMI and BCWI sufficient to make them agents of the state, Mrs. Sierra's allegations that these defendants substantially deviated from the "instructions" contained in the contract and sundry DJJ rules and manuals, if proved, could defeat their agent status for these purposes. Thus, we conclude that the allegations of the second amended complaint did not conclusively establish AMI's or BCWI's common law status as agents of the state for sovereign immunity purposes.
The statutory basis for AMI's and BCWI's claim to be agents of the state appears in section 768.28(11)(a), Florida Statutes (1997). It reads:

*591 Providers or vendors, or any of their employees or agents, that have contractually agreed to act on behalf of the state as agents of the Department of Juvenile Justice to provide services to children in need of services, families in need of services, or juvenile offenders are, solely with respect to such services, agents of the state for purposes of this section while acting within the scope of and pursuant to guidelines established in the contract or by rule. A contract must provide for the indemnification of the state by the agent for any liabilities incurred up to the limits set out in this chapter.
We have found no pertinent judicial interpretation of this statute or of the nearly identical provision set forth at section 768.28(10)(a), related to health care providers under contract to the Department of Corrections. Within its sphere of operation, the statute seems to broaden the circumstances under which a provider may claim sovereign immunity, such that the provider need not show that its performance is controlled by the state to the degree necessary to prove a principal-agent relationship under common law.
It is not enough, however, to demonstrate simply that the provider contracted to act on behalf of the state in the furnishing of the mentioned services. Rather, to enjoy agent's status under the statute, the provider must have acted "within the scope of and pursuant to guidelines established in the contract or by rule." § 768.28(11)(a). These last qualifications seem to echo the common law principle that an agent can lose its status as such if it deviates from its principal's instructions. Dorse, 513 So.2d at 1268. And they are akin to the limitations on immunity from tort liability enjoyed by a state officer, employee or agent under section 768.28(9)(a).[2]
Mrs. Sierra's second amended complaint did not reflect that AMI and BCWI acted pursuant to guidelines established in their contract or by rule. To the contrary, it alleged that these defendants violated pertinent guidelines. Therefore, the second amended complaint did not conclusively demonstrate that AMI and BCWI were entitled to any form of sovereign immunity protection, and the circuit court should not have dismissed Mrs. Sierra's action against them on sovereign immunity grounds.
*592 Even assuming AMI's and BCWI's status as agents of the state, the circuit court should not have dismissed the suit on the ground that these defendants enjoyed sovereign immunity from liability for intentional torts. This holding was predicated on the defendants' argument that if Mrs. Sierra could avoid their workers' compensation immunity by proving her husband's supervisor knew or should have known there was a substantial certainty that he would be injured or killed, they necessarily would be immunized from liability under the wanton and willful acts exception to state liability contained in section 768.28(9)(a).
AMI's and BCWI's reliance on this exception is misplaced. While the subsection provides that "the state or its subdivisions" shall not be liable for wanton and willful acts of its officers, employees or agents, it is clear that AMI and BCWI are not subdivisions of the state. See § 768.28(2).[3] As providers or vendors under section 786.28(11)(a), they may be deemed agents of the state, not agencies of the state.[4] Under section 768.28(9)(a), agents of the state are immune from tort liability for acts or omissions committed while acting within the scope of their employment or function, but they are not immune from liability for acts committed in bad faith or with malicious purpose or "in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Therefore, even assuming that AMI and BCWI qualified as agents of the state, a determination that the conduct charged in Mrs. Sierra's second amended complaint was wanton and willful would render them subject to liability under section 768.28(9)(a), not immune from it. On the other hand, in that case the DJJ would be immune from liability.
That said, we are not convinced that Mrs. Sierra's allegations achieved the level of "wanton and willful" as contemplated in the statute. On this point the defendants rely on the First District's decision in Elliott v. Dugger, 579 So.2d 827 (Fla. 1st DCA 1991). In that case the court held that the plaintiff, a Department of Corrections employee, had failed to allege conduct sufficient to overcome workers' compensation immunity. Moreover, the court held, if the alleged conduct was sufficient for that purpose, the action necessarily would be barred by the wanton and willful acts exception to state liability contained in section 768.28(9)(a). Even if we were to accept the holding in Elliott, it would not control here. Elliott predated the supreme court's clarification of the intentional tort exception to workers' compensation immunity in Turner. As such, it applied the stricter "virtual certainty of injury" standard to the workers' compensation immunity issue. Elliott, 579 So.2d at 830. Thus, Elliott stands for the proposition that conduct which is virtually certain to *593 cause injury or death necessarily implicates the wanton and willful acts exception to state liability contained in section 768.28(9)(a). Of course, the question posed in this case is whether the wanton and willful acts exception is necessarily invoked by conduct that is only substantially certain to cause injury or death.
Case law furnishes no real guidance on this point. The only thing that is even somewhat discernible is that both standards contemplate conduct that is worse than "gross negligence." Turner, 754 So.2d at 687 n. 4 (regarding substantial certainty of injury test); McClelland v. Cool, 547 So.2d 975, 976 (Fla. 2d DCA 1989) (recognizing that test for proving wanton and willful acts exception to employee immunity in section 768.28(9)(a) is more stringent than gross negligence exception to coemployee workers' compensation immunity in section 440.11(1)). Yet, even this notion begets uncertainty. As Judge Altenbernd ably demonstrated when writing for this court in Fleetwood Homes of Florida, Inc. v. Reeves, 833 So.2d 857, 866 (Fla. 2d DCA 2002), it is doubtful that the term "gross negligence" has precisely the same meaning in different contexts. Judge Altenbernd pointed to Glaab v. Caudill, 236 So.2d 180 (Fla. 2d DCA 1970), which bemoaned the difficulty of articulating the concept of gross negligence. "[F]rom a standpoint of degree, it is clear that gross negligence lies between simple negligence and the `wilful and wanton' conduct sufficient, if death results, to constitute `culpable negligence' within the crime of manslaughter. But we would agree that such ` * * * delimitation of `gross' or `wanton' negligence from other forms of negligence is neither conceptually satisfactory nor practically simple * * *.'" Fleetwood Homes, 833 So.2d at 867 (quoting Glaab, 236 So.2d at 182-83).
Whereas Fleetwood Homes dealt with the difficulty of applying a single concept in different contexts, here we are confronted with the task of comparing two different concepts that were devised in different contexts. The most likely connection between them seems to be yet a third concept, that of culpable negligence. As indicated in the foregoing quotation, wanton and willful conduct is often associated with culpable negligence. When, in Eller, the supreme court examined legislation that limited an employee's actions against managerial coemployees, the court defined culpable negligence as "reckless indifference" or "grossly careless disregard" of human life. Eller, 630 So.2d at 541 n. 3. Later, the Turner court observed that the culpable negligence exception discussed in Eller is "not unlike" the substantial certainty of injury exception to workers' compensation immunity. Importantly, though, the court stopped short of holding that they are equivalent. Turner, 754 So.2d at 687 n. 4.
More recently, the supreme court declined to foreclose the possibility that conduct falling shy of that necessary to exempt the defendant state subdivisions from liability under section 768.28(9)(a) nevertheless could establish a 42 U.S.C. § 1983 claim based on a deliberate deprivation of rights. Responding to a certified question in Crocker v. Pleasant, 778 So.2d 978 (Fla. 2001), the supreme court held that Florida recognizes a claim of entitlement by the next of kin to possession of the remains of a decedent, thus permitting them to file a § 1983 action based on an alleged interference with that interest. The court noted, however, that in that case the circuit court had ruled that the offending individual officials did not act in bad faith or with malicious purpose, and the plaintiffs had conceded that they could not prove willful or malicious conduct on the part of the defendants. This prompted the court to question whether the plaintiffs could prove a *594 "deprivation" under § 1983 because the United States Supreme Court has held that § 1983 applies only to deliberate decisions of government officials as opposed to merely negligent deprivations. Crocker, 778 So.2d at 988-89 (citing Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)).[5] Nevertheless, the court refused to rule as a matter of law that the plaintiffs' inability to prove bad faith, maliciousness, or wanton and willful conduct on the officials' part precluded them from proving a deliberate deprivation of rights for purposes of their § 1983 claim. Crocker, 778 So.2d at 989.
Especially in light of Turner and Crocker, we are unable to declare that the "substantial certainty of injury" standard for avoiding workers' compensation immunity requires misconduct of a degree that would necessarily be "wanton and willful" and therefore immunize a government defendant under section 768.28(9)(a). More particularly, Mrs. Sierra's second amended complaint did not affirmatively and clearly demonstrate the conclusive applicability of this sovereign immunity defense. Therefore, the circuit court erred by dismissing her action on this ground.
Finally, the circuit court accepted the defendants' argument that they were shielded by sovereign immunity because the acts alleged in the second amended complaint were planning level activities for which sovereign immunity has not been waived. See Trianon Park Condo. Ass'n, Inc. v. City of Hialeah, 468 So.2d 912, 919 (Fla.1985). For purposes of this discussion we assume that AMI and BCWI were agents of the state although, as previously discussed, their status as such could not be determined at the pleadings stage in this case. Of course, if they were not agents of the state, they were not entitled to sovereign immunity, period.
As a preliminary matter, we note that the defendants do not dispute that they owed Sierra a duty of care. See Henderson v. Bowden, 737 So.2d 532, 535 (Fla.1999) (reiterating that the question of sovereign immunity does not arise until it is determined that the defendant owes a duty of care to the plaintiff); Kaisner v. Kolb, 543 So.2d 732, 734 (Fla.1989) (same). Indeed, it is easy to see that the defendants' actions foreseeably placed their employee, Sierra, in a zone of increased risk, giving rise to a common law duty on their part either to lessen the risk or to protect him against it. See Henderson, 737 So.2d at 537; Kaisner, 543 So.2d at 735-36; see also Bardy v. Walt Disney World Co., 643 So.2d 46 (Fla. 5th DCA 1994).
We turn now to the question of whether the conduct alleged by Mrs. Sierra constituted planning level activity for which sovereign immunity has not been waived. As made clear in Kaisner, the simple classification of a government endeavor as a law enforcement or public safety activity pursuant to Trianon Park does not shield the actor from liability. The court emphasized that the planning or "discretionary" function exception to government tort liability is grounded in the separation of powers. Kaisner, 543 So.2d at 736 (citing Trianon Park, 468 So.2d at 918, and Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010, 1022 (Fla.1979)). "That is," the Kaisner court *595 wrote, "it would be an improper infringement of separation of powers for the judiciary, by way of tort law, to intervene in fundamental decisionmaking of the executive and legislative branches of government, including the agencies and municipal corporations they have created." Id.
Kaisner held that this principle does not shield acts that are "operational" in nature. An act is operational if it "is not one necessary to or inherent in policy or planning, that merely reflects a secondary decision as to how those policies or plans will be implemented." Id. at 737. On the other hand, governmental acts are "discretionary" and immune if they involve "an exercise of executive or legislative power such that, for the court to intervene by way of tort law, it inappropriately would entangle itself in fundamental questions of policy and planning." Id.
In City of Pinellas Park v. Brown, 604 So.2d 1222 (Fla.1992), the supreme court applied these tests to a suit stemming from the deaths of two innocent bystanders during a raucous high speed police chase through the streets and roads of Pinellas County.
[T]his conduct cannot honestly be characterized either as `policy' or `planning,' because it self-evidently was contrary to both. In fact, the plaintiffs have alleged that each of the police agencies had adopted a policy to the contrary. Accordingly, the actions of the police in this instance are not entitled to sovereign immunity.
Id. at 1226 (citing Dep't of Transp. v. Neilson, 419 So.2d 1071, 1077-78 (Fla. 1982)).
The same is true of the conduct alleged in Mrs. Sierra's second amended complaint. As such, it was operational activity, not shielded by sovereign immunity.

CONCLUSION
Mrs. Sierra's second amended complaint did not affirmatively and clearly demonstrate the conclusive applicability of the defendants' affirmative defenses based on workers' compensation immunity and sovereign immunity. Accordingly, we reverse the order dismissing her suit with prejudice and remand for further proceedings.
FULMER, J., and GREEN, OLIVER J., Senior Judge, Concur.
NOTES
[1] In 1995, the Ohio General Assembly enacted the "employment intentional tort" statute, codified in Ohio Revised Code section 2745.01. In this legislation, the General Assembly declared that it intended to supersede the effect of Ohio Supreme Court decisions adopting the "substantial certainty of injury" standard for avoiding workers' compensation immunity. The statutory standard required the plaintiff to prove by clear and convincing evidence that the employer deliberately and intentionally injured him. The Ohio Supreme Court later struck the statute on state constitutional grounds. Johnson v. BP Chems., Inc., 85 Ohio St.3d 298, 707 N.E.2d 1107 (1999).
[2] Section 768.28(9)(a), Florida Statutes (1997), provides:

(9)(a) No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. However, such officer, employee, or agent shall be considered an adverse witness in a tort action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function. The exclusive remedy for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers shall be by action against the governmental entity, or the head of such entity in her or his official capacity, or the constitutional officer of which the officer, employee, or agent is an employee, unless such act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. The state or its subdivisions shall not be liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of her or his employment or committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.
[3] Section 768.28(2), Florida Statutes (1997), provides: "As used in this act, `state agencies or subdivisions' include the executive departments, the Legislature, the judicial branch (including public defenders), and the independent establishments of the state; counties and municipalities; and corporations primarily acting as instrumentalities or agencies of the state, counties or municipalities, including the Spaceport Florida Authority."
[4] Certainly, for these purposes AMI and BCWI are similar to health care providers described in section 768.28(9)(b)(2), which states "(b) As used in this subsection, the term: ... 2. `Officer, employee, or agent' includes, but is not limited to, any health care provider when providing services pursuant to s. 766.1115...." Section 766.1115, Florida Statutes (1997), permitted the former Department of Health and Rehabilitative Services to contract with private medical providers to furnish free services to underserved populations.
[5] The Crocker court acknowledged that some federal courts have held that a § 1983 claim may be based on recklessness or deliberate indifference, citing as examples Stemler v. City of Florence, 126 F.3d 856, 865-66 (6th Cir.1997) (deliberate indifference); Hill v. Shobe, 93 F.3d 418, 421 (7th Cir.1996) (criminal recklessness or deliberate indifference); and Davis v. Fulton County, 90 F.3d 1346, 1352-53 (8th Cir.1996) (rejecting gross negligence). Crocker, 778 So.2d at 989 n. 12.