On Motion FOR Hearing
WARNER, J.
Appellant’s Motion for Rehearing is hereby granted. This Court’s opinion of November 9, 2011, is hereby vacated and substituted with the following opinion.
Alverna Brown, as Personal Representative of the Estate of Oral George Brown (the “decedent”), appeals from final summary judgments granted in favor of nine different defendants on appellant’s claims of violation of Brown’s civil rights under 42 U.S.C. § 1983. The nine defendants are five officers with the Broward Sheriffs Office (“BSO”) and four Broward County Fire Rescue (“BCFR”) personnel, all of whom responded to a vehicle rollover crash involving the decedent. The plaintiff claimed that the conduct of both BSO and BCFR in attending to the decedent, who was alive after the crash but subsequently expired at the hospital, violated the decedent’s civil rights. The court granted summary judgment to all defendants on the basis of qualified immunity. We reverse as to the BSO personnel, concluding that issues of fact remain as to whether they are entitled to qualified immunity under the facts of this case, and affirm as to the BCFR personnel, as there was no clearly established constitutional right of the decedent that they violated.

Facts

This case stems from the decedent’s 2001 death, which occurred after he was involved in a one-car rollover crash. BCFR personnel were required to utilize the “Jaws of Life” to help extricate the decedent from the car and lower him to the ground. Both police and fire rescue on the scene felt that the decedent was dazed. He was incoherent, was unresponsive to police commands, and began to walk away. The officers were concerned for his health and safety. He was not suspected of any criminal activity.
Independent eyewitnesses described the decedent after he was extricated from the car as appearing to be in shock, having difficulty breathing, being incoherent, moaning, staggering and leaning against a car as he kept walking around, all the while as officers tried to talk to him to find out what was wrong with him. After five minutes of getting nowhere with him, several officers threw the decedent to the ground; one had his hand on the decedent’s head while two other officers were on the decedent’s back, pulling his arms behind him to handcuff and ultimately hogtie him. The officers on the decedent’s back were telling him to stop flailing his arms, but it did not appear that he understood. The decedent at no time acted aggressively towards police or paramedics. One witness stated that it appeared that the police were rough in handling the decedent because he was not responding to their commands, and not because they needed to immobilize him for treatment.
BCFR paramedics accompanied and attended to the decedent in the ambulance on the way to the hospital. The decedent was placed, still hogtied and face-down, on the stretcher, and then the paramedics put straps across the back of his knees and *884 waist. Their reasoning for leaving him face-down was the difficulty moving him due to his size and weight, and their concern .that if he had vomited, his face-down position would allow his airway to drain such that he would not choke. He was having trouble breathing, but he was not given oxygen en route to the hospital.
A few blocks from the hospital, the decedent had a grand mal seizure, with the violent activity typical of such, which lasted approximately one minute. Standard measures to stop the seizure were not attempted.
After the seizure, the decedent was unconscious, breathing deeply, and drooling in a postictal state. The paramedics left the decedent face down and did not then administer oxygen. They were close to the hospital at that time. The decedent died shortly after arriving at the hospital.
The medical examiner found that the decedent died due to positional asphyxia, which led to respiratory and cardiac failure. As the medical examiner explained:
Well, there are multiple factors in the position that he’s in. He’s on his stomach. He’s an obese man. He is in a hogtied position which puts more pressure on his trunk of his body. Not only that, he’s also cinched down tightly as described in the record to the gurney which is also compromising his chest. He’s not able to move. He’s not able to expand his chest fully to breathe.
BCFR also reviewed the incident and issued a memorandum identifying nine issues that cumulatively led to the decedent’s death, particularly due to his positioning with handcuffing and failure to properly monitor the decedent during transport to the hospital.
Following the incident, the plaintiff filed an action against the Broward County Sheriff and the BSO and BCFR personnel under 42 U.S.C. § 1983 and 42 U.S.C. § 1985. The BCFR personnel sought to dismiss the complaint, alleging that they were entitled to absolute immunity or, alternatively, qualified immunity. The trial court granted the motion, finding that the BCFR personnel were entitled to absolute immunity. The plaintiff appealed to this court in Brown, v. Jenne, 941 So.2d 447 (Fla. 4th DCA 2006), and we reversed, finding that the county personnel were not entitled to absolute immunity. We did not, however, decide the issue of qualified immunity.
On remand, the nine defendants involved in this appeal moved for summary judgment on the grounds of qualified immunity. The trial court found that “all the players were at least performing their job accordingly and they would, therefore, under this section of the federal statute be entitled to qualified immunity.” With respect to the BCFR personnel, the trial court found that “[pjlaintiff has not submitted evidence that their actions violated clearly established constitutional and/or statutory law.” This appeal follows.

Summary Judgment

Orders granting summary judgment are reviewed de novo. Fla. Atl. Univ. Bd. of Trs. v. Lindsey, 50 So.3d 1205, 1206 (Fla. 4th DCA 2010). A summary judgment can be affirmed only where there are no genuine issues of material fact and the movant is entitled to a judgment as a matter of law. Volusia Cnty. v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000). When a defendant moves for summary judgment, the trial court’s function is to determine whether the moving party proved the nonexistence of a genuine issue of material fact. Le v. Lighthouse Assocs., Inc., 57 So.3d 283, 285 (Fla. 4th DCA 2011). “Tf the record reflects even the possibility of a material issue of fact, or if different inferences can reasonably be *885 drawn from the facts, the doubt must be resolved against the moving party.’ ” Lindsey, 50 So.3d at 1206 (quoting Bender v. CareGivers of Am., Inc., 42 So.3d 893, 894 (Fla. 4th DCA 2010)). Summary judgment is proper only where the facts are “ ‘so crystallized that nothing remains but questions of law.’ ” Tolan v. Coviello, 50 So.3d 73, 74 (Fla. 4th DCA 2010) (quoting Cohen v. Cooper, 20 So.3d 453, 455 (Fla. 4th DCA 2009)).
Qualified Immunity Standard
“ ‘Qualified immunity shields government officials from liability for civil damages for torts committed while performing discretionary duties unless their conduct violates a clearly established statutory or constitutional right.’ ” Furtado v. Law, 51 So.3d 1269, 1274 (Fla. 4th DCA 2011) (quoting Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir.2008)). “ ‘[Qualified immunity for government officials is the rule, liability and trials for liability the exception.’ ” Fernander v. Bonis, 947 So.2d 584, 588 (Fla. 4th DCA 2007) (quoting Alexander v. Univ. of N. Fla., 39 F.3d 290, 291 (11th Cir.1994)).
The government official has the initial burden of showing that he or she acted "within his/her discretionary authority-if the official meets that burden, the burden shifts to the plaintiff to show the lack of good faith on the official’s part by demonstrating that his/her conduct violated “clearly established” constitutional rights, of which a reasonable person would have known. Vaughan v. Fla. Dep’t of Agric. & Consumer Servs., 920 So.2d 650, 651-52 (Fla. 4th DCA 2005). In other words, first, viewing the evidence in the light most favorable to the plaintiff, the plaintiff must show that the government officials violated a constitutional right; and, second, if such a violation occurred, it must be determined if that right was clearly established at the time of the incident. Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir.2005) (citing Saucier v. Katz, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).
Claim Against BSO Officers
Appellant argues that the BSO officers affected a Fourth Amendment seizure of the decedent by using excessive force when they threw him to the ground, hogtied him, and handcuffed him. As succinctly stated in Graham v. Connor, 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989),
A “seizure” triggering the Fourth Amendment’s protections occurs only when government actors have, “by means of physical force or show of authority, ... in some way restrained the liberty of a citizen,” Terry v. Ohio, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889 (1968); see Brower v. County of Inyo, 489 U.S. 593, 596, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989).
Claims against law enforcement officers involving excessive use of force must be analyzed under the Fourth Amendment “reasonableness” standard. Graham, 490 U.S. at 396, 109 S.Ct. 1865. In determining reasonableness, “the question is whether [the] officers’ actions are ‘objectively reasonable’ in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.” Id. at 397.
Thompson v. Douds, 852 So.2d 299 (Fla. 2d DCA 2003), applies Graham to a case factually similar to this case. There, an officer received a report of an individual walking on the interstate. When the officer encountered the individual, Magyar, he did not appear alert and told the officer that he had high blood pressure and diabetes. The officer coaxed Magyar into his police vehicle and took him to an abandoned gas *886 station to wait for an ambulance. Magyar exited the vehicle, making some statements of his belief that the officer would try to hurt him. Another officer arrived, and Magyar began to walk away. The officers ordered him to stop, and he did, returning to the station. However, he again began to walk away faster, and the officers took chase. When they caught him, Magyar began to struggle. The officers took him to the ground, and both officers jumped on top of the struggling Magyar. They handcuffed him, but did not get off of Magyar’s body until it went limp. They then rolled him over, and his lips were blue. He was transported to the hospital where he remained in a persistent vegetative state.
Magyar’s guardian filed a section 1983 claim against the officers claiming the use of excessive force in a Fourth Amendment seizure. The officers moved for summary judgment on the issue of qualified immunity, which the trial court granted, but the Second District reversed. Applying Graham, the court held that the force used against Magyar was excessive. Thompson, 852 So.2d at 806. First, the court reasoned, Magyar was not suspected of any criminal activity. “Because serious force is appropriate for a more serious crime and less force is appropriate for a less serious offense, ... the fact that Magyar had committed no offense at all militates against the use of any force-much less the force used in this case to effect Magyar’s detention.” Id. (internal citation omitted). Second, Magyar posed no immediate threat to the officers or others. Third, Magyar’s resistance did not justify the extent of force used by the officers. Similarly to the facts of this case, the court dismissed the officers’ claim that Magyar’s large size required them to exert the force they did.
As to the second determination for qualified immunity, the Thompson court found that the excessiveness of the force was clearly established at the time of the incident, which in Thompson occurred in 1998. The court looked first to Graham, which also involved excessive force against a diabetic. See Graham, 490 U.S. at 388, 109 S.Ct. 1865. There, an officer was suspicious of Graham when he saw him dash into a convenience store and come right out. Graham was in fact trying to get some orange juice because he was going into diabetic shock. The officer stopped Graham, and despite Graham’s protests and pleas, the officer placed him in the patrol car. Graham exited, ran around, and then passed out. The officer handcuffed him, and Graham ended up with a broken foot, bruises and abrasions. Ultimately, the officers discovered that nothing had happened in the convenience store, and Graham was released. Although the district court and circuit court both found that qualified immunity protected the officers against an excessive force claim, the Supreme Court held that the claim must be analyzed under the Fourth Amendment’s “objective reasonableness” standard and remanded for that analysis. Id. at 399, 109 S.Ct. 1865. It did not find that the officers were entitled to qualified immunity as a matter of law.
Thompson pointed to two other cases involving the use of excessive force, which it found clearly established the constitutional right to be free of force similar to that used on Magyar. In Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir. 1998), after officers used force against two individuals, throwing one to the ground and slamming the other into the hood of the patrol car, the court found that any reasonable officer would have recognized that the force used was excessive where the individuals were suspected of no crime and did not pose a threat to anyone. Simi *887 larly, in Spann v. Rainey, 987 F.2d 1110, 1114-15 (5th Cir.1993), the court found officers used excessive force in kicking and stomping on an individual who was suspected of no crime. In both of these cases, as noted in Thompson, no crime was suspected. Therefore, the use of such great force was deemed unreasonable.
This case is most similar to Thompson. The BSO did not suspect any criminal activity. They knew that the decedent had been in a vehicle accident. Despite this, they threw him to the ground, lay on top of him, and hogtied him. Such use of force against a person who has committed no crime and is not a danger to others has been established in the foregoing case law as excessive. Graham, Thornton, and Spann were decided well prior to the incident in this case, which occurred in 2001. Therefore, the law was clearly established that use of such force against a person not suspected of any criminal activity may be excessive and may constitute a violation of section 1983. The trial court erred in granting summary judgment as a matter of law on the qualified immunity of the officers.
The officers rely on Peete v. Metropolitan Government of Nashville & Davidson County, 486 F.3d 217 (6th Cir.2007), and Davidson v. City of Jacksonville, Florida, 359 F.Supp.2d 1291 (M.D.Fla.2005), to claim that the Fourth Amendment is inapplicable to the seizure in this case. Those cases both involve paramedics and not law enforcement personnel, a considerable distinction.
In Peete, for' example, the plaintiff brought an action against five firefighters/paramedics, claiming' that they used excessive force in restraining the decedent, who was having an epileptic seizure, by applying weight and pressure to his body and tying his hands and ankles behind his back. There, the decedent’s grandmother summoned emergency personnel to the scene. The decedent was unconscious and uncommunicative when paramedics arrived and died of asphyxiation caused by the paramedic care.
Analyzing whether there was a Fourth Amendment seizure, the court cited to standard formulations of an intentional interference with a person’s freedom of movement, or a show of authority and a submission to that show of authority. Id. at 220. Noting that the result must turn on the specific purpose and the particular nature of the conduct alleged in the complaint, the Sixth Circuit explained as follows: “[WJhere the purpose is to render solicited aid in an emergency rather than to enforce the law, punish, deter, or incarcerate, there is no federal case authority creating a constitutional liability for the negligence, deliberate indifference, and incompetence alleged in the instant case.” Id. at 221. See also Davidson, 359 F.Supp.2d at 1295 (finding the Fourth Amendment inapplicable when evidence established that, while the plaintiff physically resisted the defendant/emergency medical personnel, he was not “mentally present” to communicate a refusal of treatment, so no seizure occurred).
The Sixth Circuit distinguished Peete in a case involving law enforcement personnel. In McKenna v. Edgell, 617 F.3d 432 (6th Cir.2010), officers arrived in advance of paramedics to investigate a call that a man was having a seizure. When they arrived, they tried to-get the victim out of bed, and he resisted, causing injury. Firefighters arrived and the victim was already restrained. The district court rejected the officers’ claim of qualified immunity. The case was tried, resulting in a damage award to the plaintiff. On appeal, the circuit court affirmed the denial of qualified immunity to the officers. In discussing whether a right was clearly established *888 and whether a seizure took place, the court reviewed Peete, which, the court noted, involved paramedics, not law enforcement officers, applying force. 617 F.3d at 436-37. It concluded that Peete ’s “applicability depends on a defendant’s objective function or purpose,” further expounding:
We conclude that whether the officers were entitled to qualified immunity depends on whether they acted in a law-enforcement capacity or in an emergency-medical-response capacity when engaging in the conduct that McKenna claimed violated the Fourth Amendment. If the officers acted as medical-emergency responders, then McKenna’s claim would amount to a complaint that he received dangerously negligent and invasive medical care. Under a function-dependent view of Peete, if any right to be free from such unintentional conduct by medical-emergency responders exists under the Fourth Amendment, it is not clearly established. Peete, 486 F.3d at 219. If the defendants acted in a law-enforcement (e.g., investigative or prosecutorial) capacity, however, McKenna’s claim does not “look[ ] like a medical malpractice claim,” id. at 222; rather, his claim is that he was subject to an unreasonable seizure and search. It is certainly clearly established that police violate the Fourth Amendment when they handcuff people whom they neither suspect of criminal wrongdoing nor believe to be a danger to themselves or others.
Id. at 439-40 (footnote omitted). See also Champion v. Outlook Nashville, Inc., 380 F.3d 893, 901-02 (6th Cir.2004) (holding that Fourth Amendment seizure occurred when officers first on scene handcuffed and hobbled mentally ill individual who resisted officer’s commands, resulting in his death). Finding that the capacity in which the officers were serving at the time of the seizure was an objective one, the court concluded that “[i]t is not relevant, therefore, whether [the officers] had a law-enforcement or a medical-response intent; the focus must be on what role their actions reveal them to have played.” McKenna, 617 F.3d at 440. In McKenna, a jury issue was presented, which was resolved against the officers, thus negating a qualified immunity defense.
Thompson did not discuss any potential medical emergency claim, thus implying that the officers conduct in restraining Magyar until an ambulance arrived was clearly a law enforcement function. Indeed, in both Thompson and in this ease, the law enforcement personnel took down the individuals, lay across them, and handcuffed them because the individuals refused to submit to their verbal commands, a law enforcement function. Therefore, as in Thompson, a jury question is presented. If the officers were acting in their law enforcement capacity, the decedent’s right to be free from the use of excessive force in his seizure was clearly established. The officers were not entitled to a summary judgment on qualified immunity as a matter of law.
Claim Against BCFR Paramedics
As mentioned above, the actions of medical personnel are treated differently than law enforcement officers in the few cases involving claims against medical personnel. In this case, the actions of the BCFR personnel alleged in plaintiffs complaint involve, for the most part, the paramedics’ failure to take vital signs, administer appropriate medications and oxygen, and positioning of the decedent in the ambulance ride to the hospital. As noted in Peete, “[t]he plaintiffs excessive force claim thus looks like a medical malpractice claim rather than a Fourth Amendment or Due Process violation.” 486 F.3d at 222.
*889 A significant factor for the Peete court in its Fourth Amendment analysis rested on the unconsciousness of the decedent when the paramedics arrived. The court noted:
The plaintiff did not allege [intentional interference with freedom of movement or submission to a show of authority] in her complaint, nor is it likely that she could since Becerra was unconscious at the time of his encounter with the defendants and could not perceive any restraint on his liberty or otherwise feel compelled to submit to a governmental show of force.
Id. at 221 (emphasis supplied). To emphasize this, the court distinguished Green v. City of New York, 465 F.3d 65, 83-84 (2d Cir.2006), in which the Second Circuit found that a Fourth Amendment seizure had occurred where a non-verbal man conveyed with eye movements his objection to paramedics transporting him, which caused him injury. In the instant case, the decedent was confused, disoriented and uncommunicative when he was approached by BCFR personnel. By the time they began their treatment of him, he was already immobilized by the BSO deputies. Therefore, the show of force had already taken place. In the ambulance, the decedent was unresponsive and eventually unconscious.
Peete also relied on Jackson v. Schultz, 429 F.3d 586, 590 (6th Cir.2005), in which rescue personnel were sued for failing to provide any medical assistance to Jackson, a shooting victim, who died while en route to the hospital in an ambulance. The court began with the premise that “[i]t is not a constitutional violation for a state actor to render incompetent medical assistance or fail to rescue those in need.” Id. Although the rule has two exceptions — the custody exception and the state-created danger exception — neither applied. Id. For the custody exception to apply, a restraint on personal liberty must occur. Id. Merely placing a person, particularly an unresponsive person, in an ambulance does not constitute custody for purposes of the exception. However, the Jackson court stressed that the emergency personnel did nothing to restrain the shooting victim. Id. at 590-91. In Jackson, the court expressly found no custody because the EMTs did nothing to restrain Jackson, such as using handcuffs. Id. In Peete, the court found no custody even though the EMTs used restraints and tied his hands and ankles behind his back, on the basis that such actions of restraint were taken while the victim was unconscious. 486 F.3d at 223. Thus, the custody exception appears to apply where there is an attempt to restrain personal liberty of an individual who is capable of expressing objection to such restraint. In this case, the decedent was restrained by the BSO prior to his transport. Applying Jackson, the paramedics would not be liable for merely failure to treat the decedent. Applying Peete, the decedent was unresponsive and eventually unconscious, incapable of responding effectively to his situation.
The state-created danger exception requires three elements:
(1) an affirmative act by the EMTs that creates or increases a risk that the decedent would be exposed to “private acts of violence,” (2) a special danger to the decedent such that the EMTs’ acts placed the decedent specifically at risk, as distinguished from a risk that affects the public at large, and (3) that the EMTs knew or should have known that their actions specifically endangered the decedent.
Jackson, 429 F.3d at 591 (quoting Kallstrom v. City of Columbus, 136 F.3d 1055, 1066 (6th Cir.1998)). Because the EMTs’ conduct in failing to treat Jackson did not expose him to acts of violence, the excep *890 tion did not apply. Similarly, in this case the state-created danger exception does not apply, because the decedent was not exposed to “private acts of violence.”
In Davidson v. City of Jacksonville, 359 F.Supp.2d 1291 (M.D.Fla.2005), a case involving a qualified immunity claim against paramedics and fire rescue officers, the court addressed when a claim of Fourth Amendment seizure is inapplicable due to lack of refusal of medical treatment:
Here, while the evidence shows that Mr. Davidson physically resisted Defendants’ efforts to diagnose and treat him, there is no evidence that Mr. Davidson was aware of, or was mentally present in, the situation. Instead, it seems that any ‘resistance’ was merely a result of the diabetic episode of which Mr. Davidson was experiencing, and of which the emergency medical personnel [were] attempting to treat. The evidence before the Court establishes that Mr. Davidson was unable to communicate with or take direction from the medical personnel on scene. Had Mr. Davidson been lucid and able to communicate a refusal of treatment, including the type of restraint used, and had in fact refused treatment, such actions might properly fall under the Fourth Amendment. But under the facts of this case, the Fourth Amendment is inapplicable given the lack of refusal on Mr. Davidson’s part.
Id. at 1295. Based upon the foregoing cases, we agree with the trial court that the law was anything but clearly established that the paramedics and fire rescue personnel were violating a constitutional right of the decedent in their handling and treatment of him.
Alternatively, appellant claims that BCFR personnel violated the decedent’s Fourteenth Amendment due process rights through “deliberate indifference.” The court in Mann v. Taser Int’l, Inc., 588 F.3d 1291, 1306-07 (11th Cir.2009), held that to prevail on a Fourteenth Amendment claim for deliberate indifference to a serious medical need, a plaintiff must show: “(1) a serious medical need; (2) the defendants’ deliberate indifference to that need; and (3) causation between that indifference and the plaintiffs injury.” (citing Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir.2007)). Such claims were founded on the Eighth Amendment’s proscription on cruel and unusual punishment and treatment of prisoners. See Estelle v. Gamble, 429 U.S. 97, 104-05, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). That was made applicable to the states and to pretrial detainees through the Fourteenth Amendment. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244-45, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983). We have been unable to find a case in which the deliberate indifference claim has been successfully maintained against emergency personnel, as such claims have been limited to cases involving medical care during pre-trial detention and imprisonment. Indeed, federal courts have consistently held that there is no federal constitutional right to rescue services. See, e.g., Brown v. Commonwealth of Penn., Dep’t of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 478 (3d Cir.2003) (“[T]here is no federal constitutional right to rescue services, competent or otherwise.”); Salazar v. City of Chicago, 940 F.2d 233, 237 (7th Cir.1991) (“Government generally has no constitutional duty to provide rescue services to its citizens, and if it does provide such services, it has no constitutional duty to provide competent services to people not in its custody.”); Bradberry v. Pinellas Cnty., 789 F.2d 1513, 1517 (11th Cir.1986) (“The Constitution, as opposed to local tort law, does not prohibit grossly negligent rescue attempts nor even the grossly negligent training of state officers.”).
*891 The BCFR personnel in the case at bar were there for the purpose of rendering medical assistance to the decedent, who was uncommunicative after being involved in a rollover car accident. Like the men in both Peete and Davidson, the decedent did not cooperate with efforts to provide him medical treatment. A section 1983 claim involves the violation of a clearly established constitutional right. Mercado, 407 F.3d at 1158-59. Given the state of the law both at the time of this incident and even now, we cannot say that there was a clearly established constitutional right that the BCFR personnel violated. Therefore, BCFR personnel are entitled to qualified immunity in this case.
For the foregoing reasons, we reverse the order of summary judgment on qualified immunity as to the BSO officers and remand for further proceedings consistent with this opinion. We affirm the trial court’s final judgment as to the BCFR personnel.
POLEN, J., and EHRLICH, MERRILEE, Associate Judge, concur.