852 So.2d 299 (2003)
Jeannette THOMPSON, as Plenary Guardian of Robert Magyar, and Cecilia Magyar, individually, Appellants,
v.
Jarrod S. DOUDS, Franklin M. Drees, Victor M. Gomez, Salvatore S. Mazza, Kevin J. Petry, Charles A. Trigo, and John Womack, Appellees.
No. 2D02-3972.
District Court of Appeal of Florida, Second District.
July 18, 2003.
Rehearing Denied August 26, 2003.
*301 Michael J. Bradford, Rebecca O'Dell Townsend, Garry J. Rhoden, Daniel P. Mitchell, and Christine A. Marlewski of Gray, Harris & Robinson, P.A., Tampa, for Appellants.
Donald S. Smith, Jr., and Gwendolyn R. Hollstrom of Smith & Tozian, P.A., Tampa, for Appellees.
*302 VILLANTI, Judge.
Jeannette Thompson, as plenary guardian of Robert Magyar, and Cecilia Magyar, individually (collectively "Thompson"), challenge the trial court's order granting final summary judgment in favor of defendants, Jarrod S. Douds, Franklin M. Drees, Victor M. Gomez, Salvatore S. Mazza, Kevin J. Petry, Charles A. Trigo, and John Womack (collectively "the individual officers") in this excessive force case. Because the trial court applied the incorrect legal standard in granting summary judgment on Thompson's constitutional law claim and because fact questions preclude summary judgment on the state law battery claim, we reverse.

FACTUAL BACKGROUND
Each of the individual defendants is a police officer with the City of Tampa Police Department. The facts as developed by the record show that on October 18, 1998, at around 11 p.m., Officer Salvatore Mazza received a report that a man was walking on the interstate. Mazza drove onto the interstate, where he found Robert Magyar crossing traffic. Mazza became concerned because Magyar did not appear to be aware of the traffic around him. Therefore, Mazza made contact with Magyar. Magyar told Mazza that he had diabetes and high blood pressure, that he was not feeling well, and that he was walking to the hospital. Mazza persuaded Magyar to get into his patrol car so that he could drive him off the interstate and summon an ambulance.
Mazza took Magyar to an abandoned gas station that was a local meeting place for the police and called for an ambulance. While the two were waiting for the ambulance to arrive, Magyar began to make statements which indicated that he believed Mazza wanted to hurt him. Mazza tried to help Magyar remain calm and repeatedly assured Magyar that he was not going to hurt him. At some point, Magyar indicated that he felt ill, and Mazza let him out of the patrol car to get some air. Magyar sat down on one of the pump islands. While Magyar did not try to leave at that point, he continued to make statements to the effect that Mazza was trying to hurt him.
When the ambulance failed to arrive promptly, Mazza made a second call for the ambulance. Sergeant Franklin Drees heard the call and drove to the abandoned gas station to assist Mazza. When he arrived, Magyar was still sitting on the same pump island. As Drees and Mazza talked, Magyar continued to make statements about the officers wanting to hurt him. Finally, Magyar got up and started to walk away. Mazza ordered him to stop, and Magyar returned to the same pump island. However, a short time later, Magyar got up again and began to walk away. This time, Magyar ignored Mazza's command to stop and, instead, began to walk faster.
Mazza and Drees then chased Magyar down and grabbed his arms. Magyar began to struggle against the officers, saying that he had not done anything and that he wanted to go home.[1] Drees then began doing "leg sweeps" in an effort to get Magyar to the ground. Ultimately, Magyar fell to his hands and knees. Mazza and Drees continued to struggle with him, and they were eventually able to get Magyar face down on the ground. When Magyar continued to struggle, Mazza called for backup. Mazza testified in an internal affairs interview and in his deposition that he was "on top" of Magyar during this *303 struggle.[2] Drees testified in his internal affairs interview that he was lying on the back side of Magyar's right shoulder, using his body weight to keep Magyar down. Officer Victor Gomez, who arrived in response to the call for backup, testified in his internal affairs interview that both Mazza and Drees were lying on top of Magyar when he arrived at the scene. Gomez then lay across Magyar's legs. Officer Kevin Petry, who also responded to the backup call, testified in his internal affairs interview that Mazza and Drees were "on top of the white male" when he arrived. Officer Jarrod Douds testified in his internal affairs interview that when he arrived, Drees was lying on Magyar's right shoulder, and Douds stepped in and pinned Magyar's left shoulder. Douds also held Magyar's head to keep him from thrashing. Officer John Womack testified in his internal affairs interview that when he arrived at the scene, he could not see Magyar because Mazza and Drees were on top of him. Womack testified to using two or three "knee blasts" on Magyar to get his legs down. In addition, Douds testified to using two different "pain compliance techniques" on Magyar's back in an effort to force Magyar to release his hands so they could be handcuffed.
This use of force did not stop once Magyar was handcuffed. Petry testified in his internal affairs interview that several officers continued to physically hold Magyar down after he was handcuffed and after his legs were bound with rope. Mazza testified that he sat on top of Magyar's legs to keep him from rolling even after Magyar was already handcuffed and bound. Douds testified that he and Drees continued to lie across Magyar's shoulders after he was handcuffed until he "went limp." When the officers rolled Magyar over after he went limp, Magyar was not breathing, he was unresponsive, and his lips were blue. Several officers testified to seeing abrasions on Magyar's face and blood coming from his nose when Magyar was first rolled over. While Magyar regained some level of consciousness in the ambulance, he was in total cardiac and respiratory arrest when he arrived at the hospital. Magyar has been in a persistent vegetative state since the night of the incident.
In their depositions, the individual officers gave accounts of their activities on the night in question that differed drastically from their internal affairs interviews. While the officers admitted at deposition that they used knee blasts and other pain compliance techniques to subdue Magyar, all of them denied ever sitting on Magyar or using their body weight to restrain him. All of the officers denied seeing any injuries to Magyar's face when he was rolled over. Further, all of the officers denied using any force on Magyar once he was handcuffed and bound with rope. The officers offered no plausible explanation for the severity of Magyar's injuries, variously attributing them to Magyar's own actions in the ambulance, the actions of the paramedics in intubating Magyar, or the actions of the physicians in the emergency room in resuscitating Magyar.
In Thompson's amended complaint, she asserted a claim against the individual officers pursuant to 42 U.S.C. § 1983 for violation *304 of Robert Magyar's constitutional rights and a claim under state law for battery.[3] In response to the section 1983 claim, the individual officers asserted that they were entitled to qualified immunity. In response to the battery claim, the officers asserted that they were entitled to statutory immunity under section 768.28(9), Florida Statutes (1997). After significant discovery, the individual officers moved for summary judgment based on these affirmative defenses. The trial court granted final summary judgment in favor of the officers as a group, finding as a matter of law that their actions were reasonable. The trial court made no findings of fact relating to the reasonableness of any individual officer's conduct. It is this final summary judgment that Thompson challenges in this appeal.

SECTION 1983 CLAIM
Thompson first contends that the trial court erred in granting summary judgment in favor of the individual officers on the basis of qualified immunity. Thompson contends that the trial court used the improper legal standard when determining the qualified immunity issue. She also contends that even if the correct standard was used, summary judgment was inappropriate under the facts of this case. We agree.
Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). It is an immunity from suit rather than a defense to liability. Saucier v. Katz, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Thus, entitlement to qualified immunity is generally a question of law for the court rather than a question of fact for a jury.
There are two questions that must be answered in order to determine whether a particular defendant is entitled to qualified immunity. First, taking all of the facts in the light most favorable to the plaintiff, the court must determine whether the facts as alleged demonstrate a violation of a constitutional right. Saucier, 533 U.S. at 201, 121 S.Ct. 2151. Second, assuming a constitutional right was violated, the court must determine whether that constitutional right was "clearly established." Id. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202.
In granting the individual officers summary judgment on the qualified immunity issue, the trial court found that the cases cited by Thompson in opposition to the motion had facts "materially different from the facts herein." Therefore, the trial court found that Thompson had failed to prove that the law was "clearly established." However, as the Supreme Court recently held, whether cases exist with materially similar facts is not the dispositive legal inquiry. In Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), the Supreme Court specifically rejected any requirement that the facts of previous cases be materially similar to those of the case before the Court. The Supreme Court noted that prior federal circuit court precedent had so held, but the Court stated that such holdings were "not consistent with our cases." Id.
*305 As we have explained, qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Saucier v. Katz, 533 U.S., at 206, 121 S.Ct. 2151, 150 L.Ed.2d 272. For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see Mitchell [v. Forsyth, 472 U.S. 511,] 535, [sic] n. 12, 105 S.Ct. 2806, 86 L.Ed.2d 411; but it is to say that in the light of preexisting law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).
Hope, 536 U.S. at 739, 122 S.Ct. 2508. Thus, the salient question for the court is whether the law in place at the time of the incident gave the officers fair warning that their treatment of the plaintiff was unconstitutional. Id. at 741, 122 S.Ct. 2508.
To be fair, the Hope decision was released one month after the trial court granted the individual officers summary judgment in this case. However, as the Hope case specifically points out, the decision is based on prior precedent from the Supreme Court. Therefore, the trial court applied the incorrect legal standard when it granted the individual officers' motion for final summary judgment based solely on the lack of a materially similar case. Usually when a trial court applies the incorrect legal standard, we reverse and remand for a new hearing at which the trial court must reconsider its decision in light of the proper legal standard. However, because it is clear from the record that the individual officers are not entitled to qualified immunity as a matter of law at this stage of the proceedings, we simply reverse on this issue.
In applying the correct legal standard, the first inquiry in determining whether a government official is entitled to qualified immunity as a matter of law is whether the facts as alleged by the plaintiff show that the official violated a constitutional right. In making this decision, the trial court must consider all of the facts alleged in the light most favorable to the plaintiff and must determine whether those facts state a constitutional violation. Johnson v. Jones, 515 U.S. 304, 311, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002); Cottrell v. Caldwell, 85 F.3d 1480, 1486 (11th Cir.1996). It is immaterial whether the defendant offers a different version of the facts. Lee, 284 F.3d at 1190.
When a plaintiff alleges a violation of the Fourth Amendment, the question is whether the search or seizure was effected with reasonable force. Determining whether the force used in a particular seizure was reasonable requires consideration of "`the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (quoting Tennessee v. Garner, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). In balancing these interests, the court must consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. The force used must be reasonably proportionate to the need for that force, see id., and the question is whether the totality of the circumstances justifies the particular sort of seizure. Garner, 471 U.S. at 8-9, 105 S.Ct. 1694. Moreover, the *306 reasonableness test is an objective one. Graham, 490 U.S. at 397, 109 S.Ct. 1865. Thus, while "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force," neither will "an officer's good intentions make an objectively unreasonable use of force constitutional." Id.
In this case, the officers' laudable intentions are not questioned. Rather, the only question is whether the force used to effectuate these intentions was excessive. Our review of the record shows that the use of force was objectively unreasonable based on the information the individual officers had. First, Magyar was not suspected of committing any crime. At the most, he had committed an infraction that would subject him to a civil citation but not detention. At the least, he was simply waiting voluntarily with the police for an ambulance to arrive. When no crime has been committed, this fact weighs heavily in favor of finding the use of force excessive. Because serious force is appropriate for a more serious crime and less force is appropriate for a less serious offense, see Lee, 284 F.3d at 1198, the fact that Magyar had committed no offense at all militates against the use of any forcemuch less the force used in this case to effect Magyar's detention. That Magyar was a "big guy," a fact which was repeatedly stressed at oral argument, is irrelevant because the use of force was improper ab initio.
Second, taking the evidence in the light most favorable to Thompson, Magyar did not pose an immediate threat to either the officers or others. Clearly, when Magyar walked quickly away from the officers, he posed absolutely no threat to them. Further, there is no evidence that Magyar posed any immediate threat to others. While the individual officers asserted that Magyar might have been heading back onto the interstate where he might have caused an accident which might have injured others, this chain of speculation does not establish that Magyar posed an immediate threat to either others or himself. Further, the individual officers' assertion that Magyar's health might have resulted in him falling into a diabetic coma on the side of the road cannot change the fact that their use of force was unreasonable. As noted in Graham, the officers' good intentions cannot make the use of unreasonable force constitutional.
Third, while there is evidence to show that Magyar was resisting the officers' efforts to detain him, this fact simply does not warrant the amount of force used in this case. The evidence shows that the officers continued to exert force against Magyar even after he was handcuffed and after his legs were bound with rope. The use of the officers' body weight to prevent Magyar from rolling when he was already handcuffed and bound was simply not necessary to effect his detention or to prevent harm to the officers or others. Taking the facts in the light most favorable to Thompson and balancing the three considerations set forth in Graham demonstrates that the individual officers used unreasonable force in detaining Magyar. Therefore, the facts as alleged support a finding that the individual officers violated Magyar's Fourth Amendment rights.
Having established that the facts alleged show a violation of the Fourth Amendment, this court must consider whether that constitutional right was clearly established. The question is whether the individual officers should have known based on the state of the law at the time of the incident that their actions violated Magyar's Fourth Amendment rights. This does not mean that the individual officers had to know of an actual case on point. Rather, the question is whether the individual officers had fair warning that their *307 treatment of Magyar was unconstitutional. See Hope, 536 U.S. at 741, 122 S.Ct. 2508. Here, the law at the time of the incident was sufficiently clear to give the individual officers fair warning that their actions violated Magyar's constitutional rights.
While no materially similar case is required, the facts in Graham are sufficiently similar to show that the law on this issue was clearly established. In Graham, Graham, who was diabetic, began to suffer from an insulin reaction. Graham, 490 U.S. at 388, 109 S.Ct. 1865. He asked a friend to drive him to a convenience store to buy juice; however, when they got to the store, the line was very long. Id. Therefore, Graham hurried out of the store and asked his friend to drive him to a friend's house instead. Id. at 389, 109 S.Ct. 1865. A police officer saw Graham walk hastily in and out of the store and became suspicious that something had happened. Id. Therefore, the officer stopped Graham's car and ordered Graham to wait while he found out what, if anything, had happened in the store. Id. When Graham explained that he was suffering an insulin reaction, the officer called for assistance, but he refused to allow Graham to obtain juice. Id. Graham then got out of the car, ran around it twice, and passed out. Id.
When backup officers arrived, they rolled Graham over and handcuffed his hands tightly behind his back. Id. Several officers then lifted Graham up by his arms, carried him to the car, and laid him face down on the hood. Id. The officers later threw Graham headfirst into the back seat of a police car. Id. The officers refused Graham's repeated requests for juice or sugar, as well as his request that they look in his wallet to see his diabetic decal. Id. At some point during this encounter, Graham suffered a broken foot, cuts on his wrists, a bruised forehead, and an injured shoulder. Id. at 390, 109 S.Ct. 1865. Ultimately, the police learned that nothing had happened at the convenience store, and they released Graham without charging him. Id. at 389, 109 S.Ct. 1865. Based on these facts, the Supreme Court held that the officers were not entitled to qualified immunity as a matter of law. It therefore remanded the case for further consideration.
In this case, Magyar, like Graham, was suffering from an insulin reaction. Unlike Graham, however, Magyar was not even suspected of having committed a crime. The Supreme Court found that the force used by the officers in Graham was arguably excessive under the circumstances presented, particularly because the officers were aware of Graham's medical condition but chose to ignore it. Given that the force used in Magyar's case was more extreme than that used in Graham in a situation that was much less compelling and given that Graham had been on the books for nine years before the incident with Magyar, the individual officers in this case had fair warning that their conduct was unlawful. This is particularly true because Graham held that the proportionality between the force used and the crime committed was the most important factor in determining excessiveness.
Further, there were at least two federal circuit court cases issued before the incident involving Magyar that held that the level of force used by the individual officers in this case was improper when the victim was not suspected of committing a crime. In Thornton v. City of Macon, 132 F.3d 1395, 1397-98 (11th Cir.1998), two officers were providing assistance to a woman who was trying to collect her belongings from her former boyfriend's home. The police originally saw the boyfriend, Thornton, on the porch of his home. Id. at 1398. When the officer approached Thornton and told him why he was there, *308 Thornton responded by saying that he had done nothing wrong, and he asked the officer to leave. Id. Rather than leaving, the officer called for backup. Id. Thornton then went inside and shut the door. Id. The officers then tried unsuccessfully to get Thornton to come out of the house. Id. Ultimately, when Thornton opened the door, the officers charged into the apartment, grabbed his arms, threw him to the floor, cuffed his hands behind his back, dragged him outside, and shoved him into a police car. Id. When a friend tried to assist Thornton, the officers slammed the friend onto the hood of the police car and handcuffed him. Id. In denying qualified immunity to the officers, the court noted that because neither Thornton nor his friend were suspected of any crime and because they posed no threat to anyone, the officers were not justified in using any force to arrest them, and a reasonable officer would have recognized the force used as excessive. Id. at 1400.
Similarly, in Spann v. Rainey, 987 F.2d 1110, 1112 (5th Cir.1993), officers were called to a doctor's office when Spann arrived and allegedly began causing a "disturbance." When the officers arrived, they were directed to Spann. When the officers asked for Spann's identification, he did not respond. At that point, Officer Rainey grabbed Spann's arm, and Spann then "lunged forward, grabbing Officer Kendrick in the neck/collarbone area." Id. Officer Rainey then hit Spann over the head with a flashlight, causing Spann to fall. Id. When Spann attempted to get up, Officer Rainey hit him again. Id. Spann alleged that he was then kicked, stomped, beaten, handcuffed, and dragged down the stairs. Id.
In denying qualified immunity to Officer Rainey, the court stated:
[W]e cannot conclude that a reasonable police officer would think the extent of force allegedly used was necessary under the circumstances. It is uncontested that the only charge ultimately filed against Spann was resisting arrest. He contends that he was not being arrested for any underlying crime and that no warrant for his arrest was outstanding. He further contends that he "was not violating any laws, was not attempting to interfere with any defendants' execution of duties, and was not engaged in assaulting, threatening ... behavior toward the ... officers ... or any other citizen."
Id. at 1116. Because the level of force used was not reasonable under the circumstances, Officer Rainey was not entitled to summary judgment on the issue of qualified immunity. Id.
In both Thornton and Spann, as in this case, the plaintiffs were not suspected of committing any crime. The case law clearly held that the level of permissible force is very low when there is not even a suspicion that a crime was committed. Spann was decided in 1993. Thornton was decided nine months before the incident involving Magyar. These cases provided fair warning to the individual officers in this case that the level of force they used with Magyar was unlawful.
Because the facts as alleged by Thompson show the violation of a constitutional right and because that right was sufficiently clearly established for the individual officers to have fair warning that their conduct was unlawful, the trial court erred in granting final summary judgment in favor of the individual officers on this issue.

STATE LAW BATTERY CLAIM
Thompson next contends that the trial court erred in granting final summary judgment in favor of the individual officers on the state law battery claim. We agree.
*309 The parties do not dispute that the sovereign immunity statute, section 768.28(9)(a), Florida Statutes (1997), generally protects government officials from individual liability for damages. However, an exception to this statutory immunity applies when the governmental official "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." § 768.28(9)(a). Here, while there is no evidence that the individual officers acted in bad faith or with a malicious purpose, there is a genuine issue of material fact as to whether the individual officers' actions constituted a wanton and willful disregard of human rights. Therefore, the trial court erred in granting final summary judgment on this basis.
There are two facts that are most telling on this issue. First, the level of force applied to Magyar by the officers arriving at the scene in response to the call for backup arguably shows a wanton and willful disregard for human rights. When Womack arrived at the scene, he gave Magyar two or three "knee blasts" without having any idea of why the officers were struggling with Magyar. Similarly, Douds used two "pain compliance techniques" on Magyar's back without having any idea of the reason for the struggle. Drees testified in his deposition that he told the backup officers as they approached that they were not to hurt Magyar because they were only trying to get him to the hospital. Clearly, if the officers heard and ignored Drees' warning, their actions constituted a wanton and willful disregard for human rights.
Second, several officers continued to hold Magyar down with their body weight after Magyar was handcuffed and bound with ropes. Douds testified in his internal affairs interview that he and Drees continued to use their body weight across Magyar's shoulders after Magyar was handcuffed and that they did not let up until Magyar "went limp." Mazza testified that he lay across Magyar's legs after Magyar was handcuffed and bound to keep Magyar from rolling. Clearly, having at least three officers use their full body weight to hold down a handcuffed and bound suspect raises a question as to whether their actions constituted a wanton and willful disregard for human rights and safety.
The individual officers assert in their brief that there is no evidence that they engaged in any of this behavior, relying solely on their deposition testimony. While many of these facts are not included in their deposition testimony, these facts are documented in the transcripts of their internal affairs interviews. Standing alone, the fact that the substance of the internal affairs interviews conflicts with the substance of the officers' deposition testimony raises a genuine issue of material fact on the issue of the force used as well as on the issue of the officers' credibility.
The individual officers also argue that there can be no genuine issue of material fact because their testimony is unrefuted. They assert that Thompson cannot raise an issue of material fact because neither she nor anyone else was present to dispute the individual officers' version of events. This argument suffers from at least two deficiencies. First, the fact that there are conflicts between the officers' internal affairs interviews and their deposition testimony raises questions concerning their credibility at deposition. Thompson is entitled to rely on these discrepancies to establish a lack of credibility and to argue that the internal affairs interviews, given the morning after the incident, are more credible than deposition testimony given two years later.
*310 Second, there are photographs in the record that depict injuries more severe than those testified to by the individual officers. This photographic evidence, while not dispositive of any issue, is certainly sufficient to raise a question of fact as to the severity of Magyar's treatment at the hands of the individual officers.
The officers argue that these photographs may not be used to create a fact question when their testimony is otherwise undisputed, relying on Wood v. City of Lakeland, 203 F.3d 1288 (11th Cir.2000). However, the facts of Wood are distinguishable. In Wood, a violent, suicidal individual was barricaded in his bedroom with a knife. Id. at 1290. Officers arrived at the request of the family to assist in getting the individual out of the bedroom. Id. When the officers entered the room, the individual allegedly lunged at them with a knife. Id. The officers responded by shooting the individual, killing him. Id. The family argued that the use of force was excessive, relying on an autopsy report which allegedly showed that the angle of the bullet wounds contradicted the officers' version of events. Id. at 1290-91. The court, however, held that the autopsy report, standing alone, was insufficient to create an issue of material fact as to qualified immunity. Id. at 1291. The court noted that while the autopsy report showed that the individual's right arm was flexed and raised when the bullets passed through it into the chest, this did not contradict the officers' version of events. Id. Therefore, the autopsy report was insufficient to establish a fact question that would defeat summary judgment on the issue of qualified immunity. Id.
In this case, unlike in Wood, Thompson does not rely solely on nontestimonial evidence to raise questions of fact. While the photographs do appear to conflict with the officers' testimony, they are not the only source of the dispute. Rather, the discrepancies in the officers' testimony also create issues of fact. Thus, Wood is not controlling in this case. Moreover, to the extent that Wood can be read to stand for the proposition that photographs and other nontestimonial evidence can never be used to dispute the testimony of officers present at the scene, we disagree. To ignore the photographic evidence simply because the victim is unable to give verbal testimony that refutes the officers' version of events would not serve either public policy or justice.
Because the record shows that there are genuine issues of material fact as to whether the officers acted with wanton and willful disregard of Magyar's rights and safety, the trial court's decision to grant summary judgment on the basis of statutory immunity was improper.

CONCLUSION
Based on the record as it exists, the individual officers are not entitled to either qualified immunity or statutory immunity as a matter of law. Rather, the question of whether the individual officers should be subject to liability for their actions on October 18, 1998, is one for the jury. Therefore, we reverse and remand for further proceedings on both claims.
Reversed and remanded.
NORTHCUTT and COVINGTON, JJ., Concur.
NOTES
[1] The record shows that Magyar's home was approximately three blocks from the abandoned gas station where this incident occurred.
[2] At oral argument, counsel for the individual officers insisted that the internal affairs interview transcripts were not record evidence. However, these transcripts were attached to requests for admissions served on the individual officers in June 2000, and each officer admitted in August 2000 in response to these requests that the interview transcripts were authentic, were public records, and contained statements actually made by the officers. Therefore, these interview transcripts are, in fact, record evidence that was before the trial court when the ruling on the summary judgment motion was made.
[3] The complaint also asserted various causes of action against the City of Tampa. These counts were not affected by the summary judgment in favor of the individual officers and remain pending in the trial court.