[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-12136

_____

MARIE BUTLER,

Plaintiff-Appellee,

*versus*

BOB GUALTIERI,
as Sheriff of Pinellas County, in his official capacity,

Defendant-Appellant,

AMY GEE,
in her individual capacity, et al.,

Defendants.

———————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:19-cv-02771-TPB-TGW

———————————————

Before NEWSOM and MARCUS, Circuit Judges, and MIDDLEBROOKS,[*] District Judge.

MARCUS, Circuit Judge:

On January 8, 2019, Marie Butler ("Butler") was having a bad night. After she consumed too much rum and started screaming at her husband outside her house, her neighbors called the police. The next thing she knew, she was arrested and transported to the county jail. But the worst was still to come. While Butler stood, intoxicated and handcuffed, at the booking counter, former deputy sheriff Amy Gee ("Gee") pushed Butler onto a concrete floor. The impact broke Butler's left arm, and she found herself sitting in the hospital as her difficult day finally came to a close.

In response to a complaint from Butler's husband, the Pinellas County Sheriff's Office ("PCSO") investigated the incident and terminated Gee's employment. A few months later, Butler sued PCSO Sheriff Bob Gualtieri ("Gualtieri"), among others, in the

———————————————

[*] Honorable Donald M. Middlebrooks, United States District Judge, for the Southern District of Florida, sitting by designation.

Middle District of Florida, alleging several state and federal constitutional claims. The parties now agree that Gee behaved inappropriately on the night of January 8, but disagree over whether Gee's behavior was so egregious that Gualtieri could not be held liable for it. Put differently, this interlocutory appeal centers entirely on whether Gualtieri is, as a matter of law, entitled to sovereign immunity with respect to Butler's state law battery claim. At this stage in the proceedings, we conclude that there is a genuine dispute of material fact as to whether Florida's sovereign immunity statute protects Sheriff Gualtieri. We affirm.

I.

A.

The entire case stems from an altercation that lasted less than a minute. Taking the evidence in the light most favorable to the non-moving party (as we must), these are the essential facts. On January 8, 2019, PCSO Deputy Sheriff Matthew Schultheis ("Schultheis") arrested Butler in Largo, Florida for "disorderly intoxication," a second-degree misdemeanor. Schultheis transported Butler to the Pinellas County Jail and brought her inside in handcuffs. At around 9:40 p.m., former Deputy Sheriff Gee took hold of Butler's right arm and led her to the jail's booking area; Schultheis followed closely behind.

Schultheis was standing about one foot behind Butler and Gee when Deputy Sheriff Rodney Mitchell ("Mitchell") walked over to the booking counter and began the booking process.

Butler, still handcuffed, was standing to the left side of Gee.  In a video recording of the booking area, Butler appeared quiet and unresponsive, ignoring a question that Gee asked her.  Suddenly, Butler shifted to the left, away from Gee, and Gee immediately pulled Butler back to the right.  In the video, Gee can be heard saying, "Don't pull away from me, okay?"  A second later, Butler moved her body farther to the left, while also stepping away from Gee with her left foot.

Gee responded instantly, grabbing hold of Butler, placing her right foot behind Butler's legs, and knocking Butler down to the concrete floor.  In the video of the incident, Gee's hand appeared to be close to Butler's neck while Gee was placing her foot behind Butler's legs, but it is unclear whether Gee's hand actually touched Butler's neck.  It is also unclear whether Gee's hand remained in that position while Butler was falling, as Gee's body blocked the view of Butler's upper body.  Butler fell on her left side, and as Gee rolled Butler onto her stomach, Gee exclaimed, "Are you fucking kidding me?"  After she fell, Butler began crying and yelling, but her precise statements are unintelligible.

Immediately thereafter -- "within 3 seconds" of Butler's fall -- three other deputies moved toward the scene and "were standing around Gee."  Gee pulled Butler up to a standing position by lifting her left arm, while another officer lifted Butler by her right arm.  Butler, however, had injured her left arm when she fell on the concrete floor.  Later that night, police officers took her to the hospital, where she was diagnosed with a fractured left humerus.

After Butler's husband filed a complaint with the Sheriff's Office, the PCSO Administrative Investigation Division's Professional Standards Bureau began investigating Gee's takedown of Butler.  The inquiry involved "interview[ing] 20 witnesses, including Plaintiff and Gee, and review[ing] video; reports; photographs; PCSO's General Orders; Gee's training records and employee evaluations; and medical documentation."  The PCSO ultimately concluded that Gee had violated a PCSO policy that required individuals who were in custody to "be kept secured and treated humanely and [ ] not be subjected to physical abuse."  Gee was terminated on April 5, 2019.

Prior to her termination, in an interview with the PCSO's Professional Standards Bureau, Gee testified that she thought Butler did not want to cooperate in the intake process and had "forceful[ly]" pulled away from her, and in response, Gee had "redirect[ed]" Butler to the floor.  However, Gee explained that, at the time of the takedown, she was not worried that Butler would hurt her.  Gee also admitted that (1) "she did not have control over Plaintiff during the takedown"; (2) "the likelihood Plaintiff would be hurt when Gee tripped and pushed her backward to the concrete was good"; and (3) "her use of force was not reasonable under the totality of the circumstances."  Both Butler and Gualtieri agree that "Gee's use of force was unnecessary; unreasonable; excessive; without just cause; intentional; and without provocation."

During the interview, Gee insisted that she was not upset, frustrated, or agitated at the time of the takedown.  She explained

that she said, "are you fucking kidding me?" during the takedown because she was "disappointed" that Butler had escalated a simple intake process. Gee claimed she was "upset with [her]self" after learning about Butler's broken arm, because she had not intended to "inflict[] pain on someone in that nature."

The PCSO's Professional Standards Bureau also interviewed several other police officers. Schultheis, who was standing right behind Butler at the booking counter, explained that it is "uncommon" for an officer to use force on an arrestee who was brought in because of a domestic disturbance, but he thought Gee had performed "a relative [sic] normal takedown." Schultheis also testified that he did not recall whether Butler had resisted Gee's hold while standing at the intake counter. However, Deputy Sheriff Mitchell, who was standing at the booking counter, said that Butler was "pulling away" from Gee at the intake counter and Gee had instructed her to stop pulling away. He opined, however, that Gee's takedown of Butler might not have been "necessary." He also testified that the incident with Butler was Gee's "first use of force" and "[s]he was kind of nervous about it."

Multiple officers testified that they generally saw two individuals fall to the ground in the intake room, but their views of that room were blocked. They also offered statements about Gee's character: Several officers stated that generally she had a calm demeanor, this was her first use of force, and she appeared "shocked" after the takedown.

The Sheriff, Bob Gualtieri, was the furthest removed from the incident.  There is no indication that he personally knew Gee or was present at the Pinellas County Jail on January 8, 2019, but, without having been qualified as an expert, he later watched the video of the takedown and offered various opinions about it.  Based on the video, Gualtieri opined that Butler did not resist Gee at the intake counter, but was simply "an intoxicated person who was sitting there off balance, swaying."  He added that it was "wrong" and "malicious" for Gee to "take somebody who's handcuffed behind their back and slam them to the ground."  Gualtieri also offered his view that "it's clear that [Gee] intentionally grabbed [Butler] by the neck and slammed her to the ground."

B.

Butler's Second Amended Complaint, filed in federal district court on August 20, 2020, featured state law battery (Count I) and negligence (Count II) claims against Sheriff Gualtieri in his official capacity, along with excessive use of force claims in violation of the Fourth and Fourteenth Amendments against Gee in her individual capacity, pursuant to 42 U.S.C. § 1983 (Counts III-IV), and a § 1983 claim of excessive force against the Sheriff in his official capacity (Count V).

Only one of Butler's claims -- the state law battery claim against the Sheriff in his official capacity -- is at issue in this interlocutory appeal.  The district court denied the Sheriff summary judgment on this claim, concluding that there is "a genuine issue

of material fact" as to whether Florida's sovereign immunity law protects Gualtieri.

This interlocutory appeal followed.

## II.

### A.

We are required to "review *de novo* our appellate jurisdiction," *Thomas v. Phoebe Putney Health Sys., Inc.*, 972 F.3d 1195, 1200 (11th Cir. 2020), because "[w]e have a duty to assure ourselves of our jurisdiction at all times in the appellate process," *id.* (quoting *Overlook Gardens Props., LLC v. ORIX USA, L.P.*, 927 F.3d 1194, 1198 (11th Cir. 2019)) (quotation marks omitted).

Additionally, we review the denial of summary judgment *de novo*, "applying the same legal standard the district court used." *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994). Summary judgment is warranted only when, "after construing the evidence in the light most favorable to the non-moving party, we find that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1286 (11th Cir. 2015) (quoting *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1263–64 (11th Cir. 2010)) (quotation marks omitted). At summary judgment, the key issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," so they are not appropriate determinations to make at the summary judgment stage. *Anderson*, 477 U.S. 255. Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969).[1]

### B.

As a preliminary matter, we are satisfied we have jurisdiction to consider this interlocutory appeal. Our conclusion is based on the Florida Supreme Court's most recent pronouncement that Florida's sovereign immunity law provides qualifying government officials with immunity from both *suit and liability*. *See Florida Highway Patrol v. Jackson*, 288 So. 3d 1179, 1185 (Fla. 2020).

It is well established that generally we have jurisdiction over only final decisions issued by district courts. *See* 28 U.S.C. § 1291.

---

[1] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (explaining that decisions issued by the Fifth Circuit prior to September 30, 1981 "shall be binding as precedent in the Eleventh Circuit").

However, the collateral order doctrine is an exception through which we may consider an interlocutory order that "(1) conclusively determines an important issue that is both (2) completely separate from the merits of the case and (3) effectively unreviewable on appeal from a final judgment." *Parker v. Am. Traffic Sols., Inc.*, 835 F.3d 1363, 1367 (11th Cir. 2016).

We've applied the collateral order doctrine to rulings on qualified immunity, which is a doctrine -- similar to sovereign immunity -- that can protect government officials who are sued in their individual capacities. *Id.* at 1365, 1367. As we have explained, because qualified immunity is designed to protect certain government officials from both liability *and* suit, if the denial of qualified immunity could not be reviewed on an interlocutory basis, the protection provided by qualified immunity would be "irretrievably lost[.]" *Id.* at 1367 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 525–27 (1985)). Thus, we regularly review rulings on qualified immunity at the interlocutory appeal stage.

We use the same analytical approach when considering whether to review on an interlocutory basis rulings involving Florida's sovereign immunity statute, which must be interpreted pursuant to state law. *See CSX Transp., Inc. v. Kissimmee Util. Auth.*, 153 F.3d 1283, 1286 (11th Cir. 1998) ("[W]e are bound by [the applicable] state court's determination of the substantive limits of the state's sovereign immunity protection."). So, in *Parker v. American Traffic Solutions, Inc.*, we explained that "an order denying *state* official or sovereign immunity is immediately appealable if

*state law* defines the immunity at issue to provide immunity from suit rather than just a defense to liability." *Parker*, 835 F.3d at 1367 (emphases added). Because our prior opinions have interpreted Florida's sovereign immunity law as providing a defense to liability *only*, we have consistently barred interlocutory appeals from the denial of sovereign immunity. *See, e.g., id.*; *CSX*, 153 F.3d at 1286.

However, Florida's legal landscape on sovereign immunity was clarified in 2020 when the Florida Supreme Court decided *Florida Highway Patrol v. Jackson*. *See* 288 So. 3d at 1185. There, Florida's high court conclusively established the scope and meaning of its sovereign immunity statute:

> In Florida, sovereign immunity is both an immunity from liability and an immunity from suit. . . . Nowhere [ ] did this Court explicitly characterize sovereign immunity as only an immunity from liability.

*Id.* (emphasis removed) (citations omitted).

In this diversity case arising under Florida law, we are *Erie*-bound[2] by the Florida Supreme Court's reading of its sovereign immunity law. According to binding case law, Florida's sovereign immunity statute affords protection, in an appropriate case, from both liability *and* suit. We are now obliged to consider the denial

―――――――――――――

[2] *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

12                    Opinion of the Court                    21-12136

of sovereign immunity on an interlocutory basis, and we have jurisdiction to address Sheriff Gualtieri's appeal.[3]

### C.

Turning to the merits of Gualtieri's appeal, the district court concluded that there is a genuine dispute of material fact concerning whether Florida's sovereign immunity statute protects the Sheriff from suit on the state law battery claim. We agree.

Florida's sovereign immunity law provides:

> The state or its subdivisions are not liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of her or his employment or [1] committed in bad faith or [2] with malicious purpose or [3] in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

FLA. STAT. § 768.28(9)(a). Inasmuch as Sheriff Gualtieri can escape liability if Gee's actions were sufficiently egregious, at this stage in the proceedings, the parties adopt what appear to be

_____

[3] We also GRANT Gualtieri's motion to strike Butler's supplement to her motion to dismiss. In that supplemental filing, Butler reiterates her claim that we lack jurisdiction over this interlocutory appeal, and she attaches a recent Eleventh Circuit decision that is not relevant to her jurisdictional argument. We decline to consider Butler's supplemental filing, because it does not comply with the Federal Rules of Appellate Procedure. *See* Fed. R. App. P. 27(a)(2)(C) (providing that "[a] separate brief supporting or responding to a motion must not be filed"). But, in any event, we are bound by the Florida Supreme Court's interpretation of its statute.

counterintuitive positions.   Gee's victim Butler now minimizes Gee's aggression, while Gee's former boss, Sheriff Gualtieri, emphasizes the extreme nature of her conduct.

We are, of course, also *Erie*-bound by Florida's substantive law on sovereign immunity.  Several of Florida's cases are instructive on the scope of the three exceptions found in the state's sovereign immunity statute -- *i.e.*, conduct taken "in bad faith," "with malicious purpose," or "in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  Recently, in *Peterson v. Pollack*, a Florida appellate court acknowledged that "the Florida Statutes do not define the phrases 'in bad faith' or 'with malicious purpose' or 'in a manner exhibiting wanton and willful disregard of human rights [or] safety,' as those phrases are used in section 768.28(9)(a)."  290 So. 3d 102, 109 (Fla. 4th DCA 2020).  However, Florida's Fourth District Court of Appeal found meaning in these terms by looking elsewhere.  First, the court observed, the term "'bad faith' . . . has been 'equated with the actual malice standard.'"  *Id.* (quoting *Parker v. State of Fla. Bd. of Regents ex rel. Fla. State Univ.*, 724 So. 2d 163, 167 (Fla. 1st DCA 1998)).  Second, the term "'malicious purpose' . . . has been interpreted as meaning the conduct was committed with 'ill will, hatred, spite, [or] an evil intent.'"  *Id.* (quoting *Eiras v. Florida*, 239 F. Supp. 3d 1331, 1343 (M.D. Fla. 2017)).  The court explained the third exception this way:

> The phrase "wanton and willful disregard of human rights [or] safety," . . . has been interpreted as

14                    Opinion of the Court                    21-12136

> "conduct much more reprehensible and unacceptable than mere intentional conduct," *Richardson v. City of Pompano Beach*, 511 So. 2d 1121, 1123 (Fla. 4th DCA 1987), and "conduct that is worse than gross negligence," *Sierra v. Associated Marine Insts., Inc.*, 850 So. 2d 582, 593 (Fla. 2d DCA 2003) (citation and internal quotation marks omitted).

*Id.*

Furthermore, under Florida's standard jury instructions, "wanton" behavior is defined as acting "with a conscious and intentional indifference to consequences and with the knowledge that damage is likely to be done to persons or property," and "willful" conduct is defined as acting "intentionally, knowingly and purposely." *Id.* at 110 (citation omitted). Florida's Fifth District Court of Appeal cited with approval this definition of willful and wanton conduct:

> Willful and wanton conduct is generally something more than ordinary negligence but less than deliberate conduct. Most definitions of willful or wanton conduct require that it appear that the defendant had knowledge of existing conditions, was conscious from such knowledge that injury would likely or probably result from his conduct, and with reckless indifference to the consequences consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result.

*Lemay v. Kondrk*, 923 So. 2d 1188, 1192 (Fla. 5th DCA 2006) (citation and quotation marks omitted).

In exploring further the contours of these exceptions to sovereign immunity, we look to several Florida cases that have given them meaning. In *McGhee v. Volusia County*, for example, the Florida Supreme Court found that there was a dispute of fact concerning the application of sovereign immunity when a police officer "lunged at [an arrestee], grabbed him by the throat, and began kicking [him] with force." 679 So. 2d 729, 730 (Fla. 1996). Although the court concluded that his conduct was not beyond the scope of his employment, the court determined that there was still a critical factual question for the jury -- whether the officer's conduct evinced bad faith, malicious purpose, or wanton or willful disregard for the arrestee. *Id.* at 733 & n.7.

Serious factual disputes have often prevented Florida's courts from applying sovereign immunity at the summary judgment stage. Thus, for example, in *Thompson v. Douds*, Florida's Second District Court of Appeal reserved a determination of sovereign immunity for the jury. There, officers were not arresting a lawbreaking citizen, but rather seeking to help a diabetic man who needed medical attention. 852 So. 2d 299, 302 (Fla. 2d DCA 2003). When the ill man began to wander away from the officers and disobeyed their orders before an ambulance had arrived, one officer chased him and pulled him down to the street, and three other officers laid on top of him, even after they had managed to secure him with handcuffs. *Id.* at 302–03. They let go of the man only

after they felt his body go "limp"; ultimately, he was left in a coma-like state. *Id.* at 303. The court held that, based on the amount of force used by the officers in this situation, "there is a genuine issue of material fact as to whether the individual officers' actions constituted a wanton and willful disregard of human rights," and therefore concluded that the officers were not entitled to sovereign immunity at the summary judgment stage. *Id.* at 309.

Still another Florida case -- *Peterson* -- further highlights the fact-specific nature of these sovereign immunity determinations, although this one arose on a motion to dismiss. There, the complaint alleged that a sheriff's deputy, who was stationed at a school, behaved negligently by not taking preventative steps to forestall a shooting that killed seventeen students and staff at Marjory Stoneman Douglas High School in Parkland, Florida. 290 So. 3d at 104. Florida's Fourth District Court of Appeal denied a motion to dismiss the complaint on sovereign immunity grounds, concluding that "a reasonable trier of fact could find that the deputy's failure to confront the shooter, and failure to take any other action to fulfill his alleged duty of protecting the students and teachers, while choosing to remain outside in a protected location to ensure his own safety," might strip him of sovereign immunity. *Id.* at 110.

Measuring the facts as they have been adduced in this case against Florida's legal standards, we agree with the district court that sovereign immunity cannot be resolved on summary judgment. Plainly, there are material factual disputes about the precise actions Butler and Gee took on the night of January 8, 2019, about

Gee's state of mind, and about the inferences that might reasonably be drawn from them.  As we see it, reasonable factfinders could disagree over whether Gee's conduct was wanton and willful, malicious, or exhibitive of bad faith.

At the outset, we note that both parties rely on some evidence that may be inadmissible.  Federal Rule of Evidence 602 requires that a lay witness's testimony be based on "personal knowledge" of the matter about which he or she is testifying.  Fed. R. Evid. 602.  In their summary judgment briefing, both parties present testimony from individuals who discussed the takedown after watching the video, but who were not actually present in the booking area when Gee pushed Butler to the ground.  Thus, for example, most of the officers who testified about this incident were sitting in an adjacent room with only a partial view of the takedown.  Sheriff Gualtieri himself opined at length about the takedown based only on his viewing of the video.  At one point, he exclaimed, "it's clear that [Gee] intentionally grabbed [Butler] by the neck and slammed her to the ground."  To the extent the Sheriff, or any of the officers, have opined as an expert about takedowns, it remains for the trial court to determine whether the witness is otherwise competent and qualified to opine about police procedures.  *See* Fed. R. Evid. 702.

In any event, we need not step into the dispute concerning the admissibility of any of this testimony, because the testimony of the officers who were present in the booking area during and after

the takedown reveals many genuine disputes of material fact -- each of which singlehandedly precludes summary judgment.

First, the nature and degree of Butler's resistance is disputed. Gee testified that Butler pulled away from her forcefully. But Schultheis, who had first forgotten that Butler pulled away from Gee, testified, after his recollection was refreshed by the video, that Butler did not exhibit much resistance in the booking area. However, after re-watching the video and facing additional questions, Schultheis changed his testimony, offering that Butler was "active[ly]" resisting Gee. The video appears to show Butler pulling away from Gee, but additional factfinding might clarify whether Butler was genuinely trying to escape Gee's grip, rather than drunkenly swaying.

Second, it is unclear whether Gee's takedown was executed properly. Schultheis recalled witnessing "a relative [sic] normal takedown." However, Gee admitted that she used unreasonable force during the takedown, and that Butler would likely have been injured upon hitting the concrete floor. Moreover, the video shows that Gee's hand was located near Butler's neck at the start of the takedown, but it is unclear whether her hand remained in that position or actually made contact with Butler's neck. Corporal Shawn Fox, who was in an adjacent room during the takedown, offered the opinion that grabbing an individual's neck is never an "appropriate" maneuver.

In light of these disputed facts, additional evidence and fact-finding concerning Butler's resistance and Gee's takedown would

assist a jury in deciding whether Gee's behavior was wanton and willful, malicious, or exhibitive of bad faith. If a jury were to find that Gee violently pushed down an arrestee who was not physically resisting her, with little prior warning, this might support a conclusion that Gualtieri is shielded from liability on Count I. On the other hand, a jury might conclude that Gualtieri is liable on Count I upon finding that Butler was forcibly resisting Gee, Gee clearly warned Butler to stop pulling away, and Gee's takedown was roughly compliant with the PCSO's protocol.

Any of these material disputes of fact justify the denial of summary judgment. There are several other material facts in dispute as well. For one, it is unclear whether Gee realized that Butler was injured when she hit the floor. Gee later acknowledged that "the likelihood [Butler] would be hurt when Gee tripped and pushed her backward to the concrete was good." Another officer who was in the booking area after the takedown said that, although Butler was "crying" after she fell, he had no memory of her complaining of any injuries. The video similarly reflects that Butler was crying and making various statements while she lay on the floor, but those statements are not intelligible from the video. Answering this factual question would further assist a jury in evaluating the appropriateness of Gee's conduct. If indeed Gee had reason to know that Butler's left arm was injured, yet she pulled on that arm anyway, a reasonable jury might conclude that her conduct evinced wanton or malicious behavior.

Last but not least, there is an important factual dispute concerning Gee's state of mind at the time of the takedown. On this record, a jury might reasonably find that Gee behaved wantonly or with bad faith or malice because she yelled, "are you fucking kidding me?" after she pushed Butler onto the floor. However, a jury could also credit Gee's explanation that she made that statement simply because she was disappointed that Butler was making the intake process harder. Gee also testified that she was not frustrated during her interaction with Butler, and got angry (with herself) only afterwards because she had not intended to injure Butler. The officers who were working on Gee's shift also offered differing accounts of Gee's mental state on the evening in question. One officer, who was in an adjoining room when the takedown occurred, testified that Gee was "extremely calm and professional" during the takedown, and was not "angry" or "upset." But others painted a less tranquil picture, testifying that Gee was "upset" or "nervous" right after the incident, and it was a "shock that Gee took someone down," given her usual tendency to avoid "physical confrontations."

Florida's sovereign immunity statute protects government officials when their subordinates act in bad faith, or with malicious purpose, or a wanton and willful disregard of human rights or safety. *See* FLA. STAT. § 768.28(9)(a). Whether Gualtieri should prevail on the defense of sovereign immunity in Count I turns on whether Gee acted with malice, "'ill will, hatred, spite, [or] an evil intent," and whether she intentionally or at least recklessly injured

Butler. *See Peterson*, 290 So. 3d at 109–110. Because the standards for applying sovereign immunity are so closely bound up with Gee's mental state, on this disputed record, summary judgment is barred as a matter of law.

Gualtieri also makes much of Butler's admission that Gee's conduct was "unnecessary, unreasonable, excessive, without just cause, intentional, without provocation and gratuitous." However, none of those descriptors is synonymous with wanton and willful behavior, malice, or bad faith. If Florida's courts have refused to find wanton and willful conduct, as a matter of law, when a police officer grabbed an arrestee by the throat and kicked him, *see McGhee*, 679 So. 2d at 730, or when three officers sat on top of an ill, diabetic man until he went "limp," *see Thompson*, 852 So. 2d at 303, there is little reason to conclude, as a matter of law, that Gee's less violent takedown of a noncompliant arrestee exhibited wanton and willful conduct that would justify the application of sovereign immunity.

Based on the profoundly conflicting evidence amassed, it is not clear whether Gee exhibited wanton and willful behavior, malice, or bad faith. It is neither the district court's role nor ours to wade into the remaining factual disputes and make determinations regarding the witnesses' credibility, let alone draw appropriate inferences from the proffered facts. These determinations lie squarely within the province of the jury. It was proper for the district court to deny summary judgment on Count I.

We AFFIRM.